## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **155 South Park LLC,** | **Case No.  4:23CV2412** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Auto-Owners Mutual Insurance Co.,** | |
| **Defendant** | **MEMORANDUM OPINION & ORDER** |

This matter is before the Court on the cross Motions for Summary Judgment filed by Plaintiff 155 South Park LLC and Defendant Auto-Owners Mutual Insurance Company.  (Doc. Nos. 27, 32.) Both parties filed Oppositions to each other's Motions (Doc. Nos. 36, 40), and Replies in support of their own Motions (Doc. Nos. 42, 44.)  Also pending is Plaintiff's Motion to Strike Exhibit B1 attached to Defendant's Motion for Summary Judgment, which was filed on April 21, 2025. (Doc. No. 41.)  Defendant filed a Brief in Opposition to Plaintiff's Motion to Strike on May 5, 2025 (Doc. No. 43), to which Plaintiff did not reply.

For the following reasons, Plaintiff's Motion to Strike (Doc. No. 41) is DENIED.  Plaintiff's Motion for Summary Judgment (Doc. No. 32) is DENIED.  Defendant's Motion for Summary Judgment (Doc. No. 27) is GRANTED IN PART and DENIED IN PART as follows.  Defendant's Motion is GRANTED with respect to Count III, but DENIED with respect to Counts I and II.

## I.    Facts

### A.    The Property and the Policy

This case arises out of a loss sustained at the real property located at 155 South Park Avenue in Warren, Ohio (hereinafter "the Property") on December 4, 2021, when (as discussed in more detail

below) a portion of the brick facade of the Property's south wall separated from the building and fell to the ground.

The Property is a two story commercial building that was originally constructed in 1927.[1]  (I. Makridis April 29, 2024 Depo. (Doc. No. 26-1) at Tr. 16; M. Caldwell Dec. 2021 Expert Report (Doc. No. 27-9) at PageID# 745.)  The Property was purchased by Plaintiff 155 South Park LLC (hereinafter "Plaintiff") in May 2010.  (Doc. No. 26-1 at Tr. 8-9, 10, 13.)  Plaintiff is owned by Irene and Nikolaos Makridis.  (*Id*.)  Ms. Makridis testified that Plaintiff purchased the approximately 32,000 square foot building at a delinquent tax sheriff's sale for $101,000, and did not have it inspected by a professional inspector or engineer prior to purchase.  (*Id*. at Tr. 15, 17, 35-36; I. Makridis Nov. 17, 2022 Depo. (Doc. No. 34-1) at Tr. 24, 25; Doc. No. 33-6 at PageID# 1104.)  Ms. Makridis operated her law firm out of the first floor of the "South Park" side of the Property until approximately July 8, 2022.  (Doc. No. 26-1 at Tr. 16, 26; Doc. No. 34-1 at Tr. 25.)

On August 12, 2021, Defendant Auto-Owners Mutual Insurance Company (hereinafter "Defendant" or "Auto-Owners") issued a commercial insurance policy (Policy Number 104603-05538477-21)[2] to Plaintiff with the term August 12, 2021 to August 12, 2022 (hereinafter "the Policy"). (Doc. No. 1-1 at PageID#s 12-159.)  It is undisputed that the Property is insured under the Policy, and that Plaintiff is the Named Insured.  (*Id*. at PageID#s 18, 20.)

---

[1] The Property consists of two sides that are divided by a wall and connected with two ramps.  (I. Makridis Nov. 17, 2022 Depo. (Doc. No. 34-1) at Tr. 10-11.)  These are referred to in the depositions as the "South Park" side and the "Easter Seals" side of the Property.  (*Id*. at Tr. 10-11.)  Plaintiff owns the entirety of the Property, but only used the "South Park" side and not the "Easter Seals" side.  (*Id*. at Tr. 11-12.)  The loss at issue in this case involved the south wall, which runs along the "South Park" side of the Property.

[2] The Policy is attached as an Exhibit to the Complaint.  (Doc. No. 1-1.)

The Policy contains the following relevant terms and conditions.  Section A of the Policy's "Building and Personal Property Coverage Form" provides that "[w]e [i.e. Defendant] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."[3]  (Doc. No. 1-1 at PageID# 72.)  In defining the term "Covered Cause of Loss," the Policy refers to the "applicable Cause of Loss Form as shown in the Declarations."  (*Id*. at PageID# 73.)  It is undisputed that the applicable Cause of Loss Form in the instant case is the "Causes of Loss - Special Form" endorsement, located at Doc. No. 1-1, PageID#s 95-103.  (Doc. No. 27 at PageID# 666; Doc. No. 32 at PageID#1017.)

In relevant part, Section A of the "Causes of Loss - Special Form" provides that "Covered Causes of Loss" means "Risks of Direct Physical Loss unless the loss is 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations, that follow."  (*Id*. at PageID# 95.)  There are three exclusions in Section B of the Policy that are relevant to the instant dispute.  The first is the so-called "Wear and Tear Exclusion," which provides as follows:

**B.     EXCLUSIONS**

\*\*\*

2.     We will not pay for loss or damage caused by or resulting from any of the following:

\*\*\*

        d.     (1)     Wear and tear;

              (2)     Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

---

[3] "Covered Property" means "the type of property described in Section A.1," which includes the building or structure described in the Declarations; business personal property; and personal property of others, as those terms are defined in Sections A(1)(a), (b), and (c). (Doc. No. 1-1 at PageID#s 72-73.)

3

\*\*\*

    (4)      Settling, cracking, shrinking or expansion;

\*\*\*

However, if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

(*Id.* at PageID#s 96-97.)

The second relevant exclusion is the "Collapse Exclusion," which is set forth in Section B(2)(k) of the Policy and provides that Defendant will not pay for loss or damage caused by or resulting from:

    k.    Collapse, including any of the following conditions of property or any part of the property:

    (1)      An abrupt falling down or caving in;

    (2)      Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

    (3)      Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

However, if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

    (a)      To the extent that coverage is provided under the Additional Coverage – Collapse; or

    (b)      To collapse caused by one or more of the following:

    1)      The "specified causes of loss";
    2)      Breakage of building glass;

4

> 3) Weight of rain that collects on a roof; or
> 4) Weight of people or personal property.

(*Id*. at PageID#s 97-98.) The term "specified causes of loss" (which is used in both the Wear and Tear Exclusion and the Collapse Exclusion) is defined in Section G(2) of the Policy (in relevant part) as follows:

> 2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

(*Id*. at PageID#s 102-103.)

The third relevant exclusion is set forth in Section B(3) of the Policy, as follows:

> 3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. However, if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> a. Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.
>
> b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.
>
> c. Faulty, inadequate or defective:
>
> > (1) Planning, zoning, development, surveying, siting;
> >
> > (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> >
> > (3) Materials used in repair, construction, renovation or remodeling; or
> >
> > (4) Maintenance of part or all of any property on or off the described premises.

(*Id.* at PageID# 98.)

5

Also relevant is Section D of the Causes of Loss - Special Form.  (*Id*. at PageID#s 100-101.)

This Section is entitled "Additional Coverage - Collapse" and provides as follows:

The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in D.1. through D.7.

1.  For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2.  We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

    a.  Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    b.  Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

    c.  Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

    d.  Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

        (1)  A cause of loss listed in 2.a, or 2.b.;
        (2)  One or more of the "specified causes of loss";
        (3)  Breakage of building glass;
        (4)  Weight of people or personal property; or
        (5)  Weight of rain that collects on a roof.

3.  This Additional Coverage - Collapse does not apply to:

    a.  A building or any part of a building that is in danger of falling down or caving in;

6

> b.  A part of a building that is standing, even if it has separated from another part of the building; or
>
> c.  A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
>
> ***
>
> 8.  The term Covered Cause of Loss includes the Additional Coverage-Collapse as described and limited in D.1 through D.7.

(*Id*.)

Lastly, the Policy contains clauses regarding cooperation, fraud, and intentional concealment. Specifically, Section E(3)(a)(8) of the "Building and Personal Property Coverage Form" (entitled "Duties in the Event of Loss or Damage") provides that "[y]ou must see that the following are done in the event of loss or damage to Covered Property: *** (8)  Cooperate with us in the investigation or settlement of the claim."  (*Id.* at PageID# 80.)  In addition, Section A of the "Commercial Property Conditions" provides as follows:

> A.  CONCEALMENT, MISREPRESENTATION OR FRAUD
>
> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> 1.  This Coverage Part;
> 2.  The Covered Property;
> 3.  Your interest in the Covered Property; or
> 4.  A claim under this Coverage Part.

(*Id.* at PageID# 113.)

## B.  The December 4, 2021 Loss

As noted above, Plaintiff suffered a loss at the Property on December 4, 2021.  On that date, a section of the brick facade (or veneer) of the south wall of the Property separated from the building

and fell to the ground.    To illustrate, the Court first sets forth an undated picture of the Property prior to the loss:



(Doc. No. 34-2 at PageID# 1266.)  The southern wall of the Property is the long brick wall that runs perpendicular to the street, and along which both a white and black car are parked.  (*Id*.)

The below is a photo of the Property's southern wall shortly after the December 4, 2021 loss:



(Doc. No. 27-9 at PageID# 751.)

Plaintiff (through Ms. Makridis) reported the loss to Defendant on December 6, 2021. (J. Steinbeck Aff. (Doc. No. 27-1) at ¶ 6.) The claim was assigned to Defendant's claims representative, Jozey Steinbeck, who called and spoke with Ms. Makridis on that date. (J. Steinbeck Depo. (Doc. No. 29-1) at Tr. 13-14.) On December 7, 2021, Mr. Steinbeck visited the Property and took photographs of the southern wall. (*Id.* at Tr. 22-24, 30; Doc. No. 27-1 at ¶ 4.) Mr. Steinbeck also spoke with Christina Hill from the City of Warren's Engineering, Planning & Building Department. (Doc. No. 29-1 at Tr. 29-30; Doc. No. 27-1 at ¶ 4.) Mr. Steinbeck then recommended to his manager that Defendant retain an engineer to opine on the cause of loss at the Property. (Doc. No. 29-1 at Tr. 26-27; Doc. No. 27-1 at ¶ 4.) After receiving his manager's approval, Mr. Steinbeck retained Rudick

Forensic Engineering to inspect the Property and render an opinion regarding causation. (Doc. No. 29-1 at Tr. 26-27; Doc. No. 27-1 at ¶ 4.)

On December 9, 2021, Mr. Steinbeck sent a Reservation of Rights letter to Ms. Makridis. (Doc. No. 27-2.) Therein, Mr. Steinbeck began by explaining as follows:

> We understand that on 12/4/2021 you were alerted by the Warren City Fire Department that a large section of your buildings brick face exterior fell off of the building onto the ground. **Based on our initial inspection and our initial investigation the suspected cause of the brick falling from the building is faulty construction, wear and tear, deterioration, and/or improper maintenance. Your policy excludes these perils. However, our investigation into the cause of the fallen brick is not concluded**.

(*Id*. at PageID# 690) (emphasis added). Mr. Steinbeck then set forth various provisions of the Policy, including the Coverage and Exclusion provisions set forth *supra*. (*Id.* at PageID#s 690-695.)

Applying these provisions to Plaintiff's loss, Mr. Steinbeck advised as follows:

> Your policy excludes wear and tear, settling, cracking, shrinkage, or expansion; deterioration, faulty maintenance, and faulty, defective, or inadequate construction. Your policy also excludes collapse as cited in section B. above [i.e., Section B(2)(d)(k)]. However, there is an additional coverage for collapse which is cited in D. above [i.e., the Additional -Coverage Collapse]. We believe that the exclusion for collapse cited in B. above is applicable and the additional coverage for collapse as cited in section D. above is not applicable. The brick that fell off of the building would not be covered by your policy if the cause of the brick falling was excluded by the policy. However, we are investigating and reviewing the policy under a reservation of rights, therefore we are bringing this policy language to your attention.
>
> We have hired Rudick Forensic Engineering to inspect the property and to provide an evaluation as to the cause of the brick falling from the building and they will contact you to set up a date and time for an inspection.

(*Id*. at PageID# 695.)

On December 14, 2021, Matthew Caldwell of Rudick Forensic Engineering inspected the Property at Mr. Steinbeck's request for the purpose of determining the cause of the loss. (M. Caldwell Aff. (Doc. No. 27-7) at ¶ 5.) Prior to the inspection, Mr. Caldwell obtained information about the

Property from the Trumbull County Auditor website, and found historic photos of the Property from June 2011 and August 2019 on Google Maps Street View.  (Doc. No. 27-9 at PageID#s 745, 747.) During his inspection on December 14, 2021, Mr. Caldwell took photographs of the Property and spoke with Ms. Makridis' brother, George Kafantaris, and an individual named Dimitrios Makridis. (*Id.* at PageID# 745.)

Mr. Caldwell thereafter authored a "Causation Report" dated December 20, 2021.  (Doc. No. 27-9.)  Therein, Mr. Caldwell first noted that the Property "had a structural steel framed structure with clay tile exterior walls, and was clad with a brick veneer."  (*Id*. at PageID# 745.)  He observed that an approximately 50' by 14' section of the brick veneer on the south elevation of the building had collapsed (as of the date of the inspection).  (*Id*. at PageID# 746.)  Mr. Caldwell explained as follows:

> Due to the collapsed brick veneer, the structural steel framing and structural clay tile exterior wall was visible. The building had been framed with approximately 20" deep steel beams, and structural clay tile had been infilled between the different steel beams and steel columns.
>
> Courses of header brick had been installed approximately every 16" vertically. However, not all of the header brick were full length. The majority of the header brick were a snap header brick, and the snap header brick did not connect/attach the wythe of brick veneer to the wythe of structural clay tile. At some locations, the full length header bricks that had been connecting the brick veneer wythe to the structural clay tile wythe were spaced up to 6' on center horizontally, some were spaced at approximately 5'-6" on center horizontally, and some were spaced at approximately 3' on center horizontally.
>
> All areas of the collapsed brick veneer were lying on the parking lot immediately adjacent to the south elevation of the building. At an approximately 4' x 8' (32 square foot) section of intact collapsed brick veneer, only one full length header brick was observed that had previously been anchoring the brick veneer to the structural clay tile.

11

(*Id*. at PageID# 746) (footnotes omitted).  Mr. Caldwell next noted that, "at the area of the collapsed brick, the brick veneer was bowed and 'hinged' outward along the top flange of the steel floor beam," and, further, that "at the non-collapsed sections of the brick, the brick along the top flange of the floor beam was displaced."  (*Id*. at PageID# 747.)  Based on his review of the historic photographs of the building from June 2011 and August 2019, Mr. Caldwell determined that "the brick had been displaced along the beam flanges long before the recent collapse."  (*Id*.)

Mr. Caldwell also noted the presence of caulking along the horizontal mortar joint of the brick veneer and concluded that "the horizonal course of brick veneer along the beam flange was displaced outward," with a ledge forming between the "adjacent courses of brick."  (*Id*.)  Mr. Caldwell found that "[t]he top of the ledge was severely stained and discolored, indicating that the brick along the roof beam had been displaced outward, with the top of the brick exposed to environmental staining, for an extended period of time."  (*Id*.)  He further concluded that the caulking of the horizontal mortar joint "indicat[ed] that the brick veneer had been subjected to outward movement since at least June 2011, long before the recent collapse."  (*Id*.)  Lastly, Mr. Caldwell observed cracked brick and severely rusted steel window lintels along the west and north elevations of the building.  (*Id*.)

Based on the above observations, Mr. Caldwell offered the following opinions regarding the cause of the loss:

1.  The collapsed brick, and the displaced and bulged brick along the beam flanges, had been caused by the combination of the lack of proper/adequate anchorage between the brick veneer and the building structure, the lack of proper expansion joints in the brick veneer, the normal and typical expansion/contraction of the brick veneer, and the differential movement between the brick veneer and the steel beams.

   a. The brick veneer had been attached/anchored back to the building structure with header brick. However, the full-length header brick was sporadically spaced up to 6'-0" on center horizontally. At some locations, a single header brick had been supporting more than 32 square feet of brick. Both current and

12

past editions of the Ohio Building Code (OBC) require brick veneer to be anchored back to the building structure. For adjustable 2-piece anchors, anchors with wire size Wl.7, and 22 gage corrugated sheet metal anchors, one (1) brick anchor/tie is to be provided for every 2.67 SF of wall area. For all other tie/anchor types, one (1) anchor is to be provided for every 3.5 SF of wall area. However, at the subject address, the spacing of the header brick far exceeded the 3.5 SF of wall area per anchor by approximately 10 times. The lack of proper brick anchorage, and the lack of proper brick expansion joints, had resulted in the collapse of the brick veneer.

b. In structures containing "punched" windows at regularly spaced intervals, more movement occurs in the brickwork above and below the openings than in the brickwork between the openings. Less movement occurs along the line of openings since there is less masonry. This differential movement creates a stress concentration where the two sections of brickwork meet, which can cause cracking and/or displacement of the brick that emanate from the corners of the opening. The collapse of the brick at the subject address, between the different window openings, indicated that the normal and typical expansion/contraction of the brick, and the differential movement at the window corners, had indeed contributed to the collapse of the brick, in conjunction with the lack of proper brick anchorage and proper expansion joints.

c. Structures that support the brick veneer on beams, usually at each floor, must have horizontal expansion joints under each beam. If proper joints are not provided between the beams and the brick veneer, the differential expansion between the brick and the beams will result in the cracking and displacement of the restrained brick, similar to the cracking and displacement observed at the horizontal mortar joints along the beam flanges. The displaced and bulged brick along the beam flanges indicated that the brick had indeed been subjected to differential movement with respect to the steel beams. The combination of the differential movement between the brick veneer and the steel beams, in conjunction with the lack of proper brick anchorage and building up stresses at the window corners, had resulted in the collapsed condition of the brick veneer.

(*Id*. at PageID#s 760-761.)   Finally, Mr. Caldwell opined that "additional cracking of the brick veneer had also been caused by the [r]ust jacking of the steel window lintels, as observed on the west and north elevations of the building."  (*Id*. at PageID# 761.)  *See also generally* Caldwell Aff. (Doc. No. 27-7).

On December 20, 2021, Mr. Steinbeck sent a Coverage Position letter to Plaintiff, which enclosed Mr. Caldwell's Report. (Doc. No. 27-3; Doc. No. 27-1 at ¶ 13.) In his letter, Mr. Steinbeck discussed Mr. Caldwell's findings and again set forth the relevant policy language (set forth *supra*) in Sections A, B, C, and D of the Policy. (Doc. No. 27-3.) Mr. Steinbeck then advised Plaintiff that Defendant was denying the claim, explaining as follows:

> After reviewing the report from Rudick Forensic Engineering, we have determined that the cause of your damages are due to wear and tear, rust and/or corrosion, settling, cracking, shrinkage, or expansion; deterioration, faulty maintenance, and faulty, defective, or inadequate construction. Your policy excludes wear and tear, rust and/or corrosion, settling, cracking, shrinkage, or expansion; deterioration, faulty maintenance, and faulty, defective, or inadequate construction. Your policy also excludes collapse as cited in section B. above. However, there is an additional coverage for collapse which is cited in D. above. We believe that the exclusion for collapse cited in B. above is applicable and the additional coverage for collapse as cited in section D. above is not applicable. It is also important to note that according to Google Maps Street View photos from 2011 and 2019 some of the issues with the brick were previously visible. After review of your policy we have determined that your damages are excluded by the policy. Your claim is now closed.

(*Id.* at PageID# 702.)

### C. City of Warren Building Department Proceedings

Meanwhile, on December 4, 2021 (i.e., the date of the loss), the City's Engineering, Planning & Building Department issued an Unsafe Building Order (Adjudication Order Number 21-1204) regarding the Property (hereinafter "the Adjudication Order"). (Doc. No. 33-6.) The Adjudication Order provided that the building was unsafe under Ohio Building Code 109.4 because "the building's exterior wall coverings have or are deteriorated to a point where they are failing and falling to the ground which may cause injury or death to persons or personal property." (*Id*. at PageID# 1105.) The City ordered Plaintiff to vacate the building; immediately install chain link barriers; "submit construction documents from an Ohio Design Professional on how the building's means of egress

14

will be protected and be able to be entered and exited safely;" and replace the building's exterior wall coverings.  (*Id*. at PageID#s 1104-1105.)  Lastly, the Adjudication Order provided that "an appeal of any or all of the items contained within this decision may be filed with the Ohio Board of Building Appeals."  (*Id*. at PageID# 1107.)

Plaintiff appealed the Adjudication Order to the Ohio Board of Building Appeals (hereinafter "OBBA") on January 3, 2022.  The OBBA conducted a hearing on Plaintiff's appeal on April 4, 2022.  *See* OBBA Hearing Transcript (Doc. No. 26-5); Doc. No. 26-1 at Tr. 59-60.  During that hearing, Ms. Makridis testified (among other things) that she and her staff were continuing to occupy the Property, despite the City's Adjudication Order that the building be vacated.  (Doc. No. 26-5 at PageID# 593.)  *See also* I. Makridis Depo. (Doc. No. 26-1) at Tr. 61 ("Q: So when this [OBBA] hearing occurred in April of 2022, you were still occupying the premises?  A:  Yes.").  At the conclusion of the hearing, the OBBA affirmed the City's Adjudication Order.  (Doc. No. 26-5.)

On April 21, 2022, Plaintiff filed an administrative appeal of the OBBA's decision to the Trumbull County Court of Common Pleas (hereinafter "the state trial court").  *See 155 South Park LLC v. State of Ohio Board of Building Appeals, et al*., Trumbull County Court of Common Pleas Case No. 2022-CV-00508 (docket) (hereinafter "Trumbull County Administrative Appeal").  Around this same time period, Plaintiff hired engineer, Richard Hughes, P.E., to "investigate the cause of collapse and assess the structural integrity of the building."[4]  (I. Makridis Aff. dated April 1, 2025

---

[4] Ms. Makridis testified in deposition, and averred in her April 2025 Affidavit, that the purpose of retaining Mr. Hughes was for him to investigate both the structural integrity of the building and the cause of the loss.  (Doc. No. 40-1 at ¶ 8; Doc. No. 26-1 at Tr. 72.)  In his Report, however, Mr. Hughes states that Ms. Makridis retained his services "to determine if the building is dangerous and on the verge of collapse to the point of abandoning the structure and what specific remedies must be carried out to satisfy the 2017 Ohio Building Code."  (Doc. No. 27-6 at PageID# 716.)

(Doc. No. 40-1) at ¶ 8; Doc. No. 26-1 at Tr. 72.)  Ms. Makridis supplied Mr. Hughes with "[1] photos of the site before and after the collapse, [2] the Insurance claim report dated December 20, 2021 [i.e., Mr. Caldwell's Report], [3] the City Engineering Department Report dated December 4, 2021, [4] the Appeal decision letter from April 6, 2022 and [5]  a brief description of the building history." (Doc. No. 27-6 at PageID# 716.)   According to Plaintiff, Mr. Hughes did not personally visit or inspect the Property.  (Doc. No. 26-1 at Tr. 73.)

On May 17, 2022, Mr. Hughes issued a report entitled "Investigation into Curtain Wall Collapse."[5]  (Doc. No. 27-6.)  At the outset, Mr. Hughes explained (in relevant part) as follows:

> The building is approximately 150 ft. long and 150 ft. deep with a steel superstructure and curtain walls consisting of clay block interior with a one width yellow brick exterior.  No provisions for thermal expansion or contraction were provided in the exterior brick construction, so from the beginning, the 94 year-old building started to have the brick veneer crack every season until it finally failed.
>
> **My opinions along with the Insurance Company engineering opinions [i.e., Mr. Caldwell's Report] are in total agreement about the root cause and origins of the failure. The cause was due to a brittle connection between the outer (brick) and inner (clay block) walls that did not have any built-in ductility for thermal expansion and contraction.** We are also in agreement about the limits or damage to the building which is confined to sections of the south walls with some concern to the front of the building (west wall). Neither one of us thinks the building should be condemned.

(*Id*. at PageID# 717) (emphasis added).  Mr. Hughes then went on to conclude, based on "the physical evidence at the site, a review of industry standards and municipal, state and federal adopted building

---

[5] A copy of Mr. Hughes' Report is attached as an Exhibit to Defendant's Motion for Summary Judgment.  (Doc. No. 27-6.) It is authenticated by the Affidavit of City of Warren Certified Building Official and Building Inspector Christopher Taneyhill, as (1) "a record kept in the ordinary course of business as a regularly conducted activity of the City of Warren's Engineering, Planning & Building Department" and (2) "a publicly available record relative to City of Warren's Engineering, Planning & Building Department files for the Subject Property."   (Doc. No. 27-5 at ¶¶  6, 7, 8.)  Plaintiff moves to strike Mr. Hughes' Report "as being hearsay and the [] the previously subject of this Court's April 30th 2024 Order restricting or prohibiting discovery."  (Doc. No. 41.)  For the reasons discussed *infra*, this Court denies Plaintiff's Motion to Strike and will consider Mr. Hughes' Report herein.

codes, plus my own publication and experience with dozens of similar construction projects over the last 40 years," that "the building integrity is fine and can be remediated."  (*Id.* at PageID# 718.)

Meanwhile, on May 10, 2022, appellee Christopher Taneyhill of the City of Warren  Building Department filed a Motion for Temporary and Permanent Injunction and Relief in the Trumbull County Administrative Appeal.  *See also* Trumbull County Administrative Appeal (docket).  Therein, Mr. Taneyhill sought an Order "restricting the owner and occupants from being in the building located at 155 South Park until such time as the property has been repaired and restored to a safe condition." (*Id.*)  Plaintiff filed a Response to Mr. Taneyhill's Motion on May 24, 2022.  (*Id.*)  Ms. Makridis testified (and the Response that Plaintiff filed in the Trumbull County Administrative Appeal indicates) that Plaintiff attached Mr. Hughes' Report as an exhibit to Plaintiff's Response.  *See* Doc. No. 26-1 at Tr. 75-76; Doc. No. 12-3 at PageID#s 238-240.  *See also* Trumbull County Administrative Appeal (docket).

The state court docket reflects that, on July 6, 2022, the state trial court ordered Plaintiff to vacate the Property on or before July 11, 2022.[6]  *See also* Trumbull County Administrative Appeal (docket).

### D.    Plaintiff retains coverage counsel and Defendant Reopens the Claim

---

[6] The state court docket reflects that, in March 2023, Plaintiff moved to stay its administrative appeal on the grounds that it had submitted plans to the City of Warren for the repairs of the Property and was "awaiting the issuance of the building permit to begin its repairs."  (*Id.*)  Mr. Taneyhill opposed the Motion on various grounds.  (*Id.*) On July 12, 2023, the state trial court issued a Judgment Entry finding that the City of Warren's Adjudication Order was supported by a preponderance of substantial, reliable, and probative evidence; affirmed the Adjudication Order; and dismissing Plaintiff's appeal.  (*Id.*)  In August 2023, Plaintiff filed a Motion to Vacate, followed by an Amended Motion to Vacate and a Second Amended Motion to Vacate.  (*Id.*)  Contemporaneously, Plaintiff appealed to the Eleventh District Court of Appeals of Ohio (hereinafter "the state appellate court").  (*Id.*)  The state appellate court remanded the case to the state trial court for consideration of Plaintiff's Second Amended Motion to Vacate.  (*Id.*)  Subsequently, on December 21, 2023, Plaintiff dismissed her state court administrative action and appeal.  (*Id.*) The state trial court then denied Plaintiff's Second Amended Motion to Vacate as moot, and the state appellate court dismissed Plaintiff's appeal.  (*Id.*)

While Plaintiff's state administrative appeal was ongoing, Ms. Makridis contacted Mr. Steinbeck and requested a certified copy of the Policy. (Doc. No. 27-1 at ¶ 14.) On June 23, 2022, Plaintiff "retained an attorney to pursue the insurance claim." (I. Makridis Aff. dated April 24, 2024 (Doc. No. 13) at ¶ 18, PageID#248.) Plaintiff then retained Gene Smithberger, P.E., to conduct a "thorough in-person investigation of the collapse and issue[] a detailed report on the cause of the collapse."[7] (Id. at ¶ 20.)

On August 18, 2022, Mr. Smithberger authored a report setting forth his opinions regarding the cause of the loss at the Property.[8] (Id.) On August 31, 2022, Plaintiff (through counsel) provided a copy of Mr. Smithberger's Report to Mr. Steinbeck. (Doc. No. 27-1 at ¶ 15.) Mr. Steinbeck then reopened Plaintiff's claim and Defendant retained coverage counsel to "engage in efforts to further investigate the claim." (Id. at ¶ 16.) According to Mr. Steinbeck, "[t]hese efforts included gathering relevant maintenance documentation about the Subject Property and conducting an Examination Under Oath of" Ms. Makridis. (Id.) In addition, Defendant (through counsel) "requested that Plaintiff provide all relevant documentation regarding the loss in Plaintiff's possession." (Id.)

It is undisputed that Plaintiff failed to either notify Defendant that it had previously retained Mr. Hughes to investigate the cause of the loss, or provide Defendant with a copy of Mr. Hughes' May 2022 Report. Mr. Steinbeck nonetheless obtained a copy of Mr. Hughes' Report on March 1, 2023, through a public records request to the City of Warren's Engineering, Planning & Building

---

[7] Ms. Makridis avers that her engagement of Mr. Hughes "was temporary and solely for the purpose of maintaining occupancy and avoiding the disruption of [her] law practice." (Doc. No. 40-1 at ¶ 9.) She states that she "did not find Mr. Hughes' findings to be credible or persuasive." (Id. at ¶ 10.) As a result, Ms. Makridis retained Mr. Smithberger "to serve as an expert in connection with the insurance claim that is the subject of this action." (Id. at ¶ 11.)

[8] The record before this Court does not contain a copy of Mr. Smithberger's Report, however, because he "has been unable to continue due to early signs of dementia." (Doc. No. 40-1 at ¶ 12.) In addition, Mr. Smithberger was not deposed in this action.

Department (hereinafter "Building Department").  (Doc. No. 27-1 at ¶ 17.)  Defendant then provided

copies of both Mr. Hughes' Report and Mr. Smithberger's Report to Mr. Caldwell for review.  (*Id*. at

¶ 21.)

On March 10, 2023, Mr. Caldwell issued a Supplemental Report in which he (1) discussed

Mr. Hughes' and Mr. Smithberger's findings, and (2) reaffirmed his previous conclusions regarding

the cause of the loss as set forth in his December 20, 2021 Report.  (Doc. No. 27-10.)  Shortly

thereafter, on March 24, 2023, Mr. Steinbeck sent a Coverage Position letter to Plaintiff's counsel,

reiterating that Defendant was standing by its December 20, 2021 coverage determination "given all

of the information from investigating the claim." (Doc. No. 27-1 at ¶ 22.)  *See also* Doc. No. 27-4 at

PageID# 709-710.  Notably, among other things, Mr. Steinbeck also stated as follows:

> Along with the enclosed courtesy copy of the Report prepared by Matthew Caldwell
> of Rudick Forensic Engineering, enclosed please find a courtesy copy of the May 17,
> 2022 Report of Richard T. Hughes. We gathered this report independently from any
> production of your client, which reflects a failure to comply with the above-referenced
> "CONCEALMENT, MISREPRESENTATION OR FRAUD" provision as well as a
> failure to comply with the Policy's "LOSS CONDITIONS", which requires
> cooperation in the investigation or settlement of the claim.

(Doc. No. 27-4 at PageID# 709.)

### E.    Plaintiff files the instant lawsuit and retains Edward Patton as its Expert

On November 28, 2023, Plaintiff filed the instant action in the Trumbull County Court of

Common Pleas.  (Doc. No. 1-1.)  Defendant removed the action to this Court on December 19, 2023

and filed its Answer on that same date.  (Doc. No. 1.)

Plaintiff subsequently retained Edward Patton to offer an expert opinion regarding the cause

of the loss.  (Doc. No. 40-1 at ¶ 13; Doc. No. 33-7.)  Mr. Patton issued a "Brick Façade Assessment

19

Report" on November 30, 2024.[9]  (Doc. No. 33-7.)  Therein, Mr. Patton began by explaining that "[t]o properly evaluate the wall system that collapsed, mortar and brick samples were taken for analysis as well as weather data collected on prior days of the event and on the day of the event." (*Id.* at PageID# 1110.)  Mr. Patton further explained that "brick and mortar specifications as well as building codes used during the 1927 construction period were reviewed." (*Id.*)  Mr. Patton opined that "an existing, legally occupied building is typically not required to comply with current code requirements, except when a jurisdiction has adopted retroactive code requirements (typically regarding life-safety) or when a building undergoes improvements classified by the code as a repair, alteration, or change of occupancy." (*Id.*) He further noted that "[i]t is our understanding that no notable changes structurally have been made to this structure," i.e., the Property. (*Id.*)

Mr. Patton then set forth his "facade wall assessment" as follows:

The brick construction was in accordance with the 1927 Uniform Building Code utilizing a Portland Cement based mortar. This was a more modern mortar and was confirmed through petrographic analysis.[10]  The analysis also revealed an approximate 11% air entrainment in the mortar as well. The brick construction utilized a row-lock style of construction rather than utilizing wall ties. *** The 1927 Uniform Building Code does not reference any requirements for expansion or contraction relief joints and masonry specifications were not developed until 1948.

---

[9] In its Motion for Summary Judgment, Defendant states that it "intends to move to exclude [Edward Patton's] opinions as an expert" because Edward Patton relied (at least in part) on lab analysis conducted by Mark Patton.  (Doc. No. 27 at PageID# 675.)  Defendant argues that Plaintiff failed to either disclose Mark Patton as its expert witness or timely disclose Mark Patton's lab analysis. (*Id.* at PageID#s 674-675.)  In addition, Defendant states that it will object to any attempt by Plaintiff to rely on Mark Patton as a fact witness "as his report reflects opinions and specialized knowledge relative to the mortar of the subject brick." (*Id.*at PageID# 675.)  Thus, Defendant states that it also "intends to move to exclude Mark Patton as a witness in this matter accordingly." (*Id.*)  While Defendant may "intend to move to exclude" the opinions of Edward Patton and Mark Patton at some point in the future, it has not yet done so as of the date of this Opinion. Accordingly, this Court will consider Edward Patton's Report (including the opinions of Mark Patton to the extent they are contained in that Report) for purposes of the resolving the instant Motions.

[10] The record before this Court also contains a report from Mark Patton dated December 10, 2024 entitled "Petrographic Examination of Mortar from a Brick Wall Collapse." (Doc. No. 33-10.)  In sum, Mark Patton concludes that "the mortars are made using cement of the time period with lime additions and based on the samples examined are sound, strong, and well-made.  Joints are full and mortar is overall well-bonded to the brick." (*Id.* at PageID# 1164.)

A review of the weather events that took place on December 03, 2021, and December 04, 2021, are instructive with regards to the collapse of this wall. On December 03, 2021, the temperatures stayed consistent throughout the day with a high temperature of 31 and a low temperature of 27 degrees Fahrenheit and the relative humidity hovering around 70 percent. On December 04, 2021, the temperatures got warmer and initially the relative humidity climbed to 89 percent. At the time of the collapse of the wall, the relative humidity took a drastic downturn by at least 30 percent within minutes of the time of the collapse. The wind picked up to over 20 mph according to the weather graphic. Keeping in mind that these recorded activities were reported at Youngstown/Warren Airport, the variation of humidity and wind speed could have been greater at the southern wall. Additionally, no precipitation had occurred over these two days and brick-and-mortar moisture levels were stable throughout the depth of the brick with the inside brick being warmer than the outside brick. Once the winds picked up with the drastic humidity drop, the front face of the brick and mortar began to dry out rapidly while the internal face remained the same as it had been for days. This rapid drying caused a contraction in the brick face separating the brick and mortar.

This contraction at the front face of the brick in combination with the inside face of brick being warmer and more humid, created an outward prying force that caused the wall to explode outward. This type of failure is consistent with what was shown in the new[s] article in the Tribune where the picture shows the bricks being a good distance from the building.

(*Id*. at PageID#s 1111-1112.) Based upon the above, Mr. Patton concluded that "the brick façade wall that collapsed was constructed in accordance with the 1927 Uniform Building Code" and "the mortar used was Portland Cement based and had excellent adhesion to the Row-Lock bricks." (*Id*. at PageID# 1112.) Mr. Patton further found that "a rare weather phenomenon occurred at the near exact time the wall collapsed with plummeting humidity and high winds." (*Id*.) He opined that "the wall collapsed from a rapid differential moisture change that caused an outward prying action sending bricks outward from the building." (*Id*.)

Mr. Patton opined that "the structural steel beams and column did not play a role in this collapse." (*Id*.) He explained that "if they were indeed the cause, the failure would have been minimal and limited to a few rows of brick due to the Row-Lock construction methods." (*Id*.) Lastly,

21

Mr. Patton opined that "no maintenance issues existed as there are no signs of water infiltration in the wall and as supported by the structural steel being clean and free of rust."  (*Id*.)

On December 2, 2024, Defendant provided a copy of Mr. Patton's Report to Mr. Caldwell for review.  (Doc. No. 33-11 at PageID# 1174.)  Mr. Caldwell issued a lengthy Supplemental Report on December 23, 2024.  (Doc. No. 33-11.)  In sum, Mr. Caldwell disagreed with Mr. Patton that the brick construction of the Property complied with the requirements of the 1927 Uniform Building Code, noting that (1) Chapter 27, Section 2715 of that Code states that "proper provisions shall be made for expansion and contraction;" and (2) Chapter 29, Section 2926 provides that "veneer shall be tied into the backing either by a header for every three hundred (300) square inches of wall surface, or by substantial non-corrodible metal wall ties spaced not farther apart than (1) one foot vertically and two (2) feet horizontally."  (*Id*. at PageID#s 1176-1177.)   Mr. Caldwell opined that the Property was not constructed per the minimum requirements of the 1927 Uniform Building Code and that, if it had been, "the collapse of the brick veneer would not have occurred."  (*Id*. at PageID# 1177.)

Mr. Caldwell also disagreed with Mr. Patton that the loss was caused by weather conditions on December 4, 2021.  (*Id*. at PageID#s 1179-1181.)  He noted that, on that date, the maximum wind speed that was reported at the Youngstown Warren Regional Airport was 25 mph.  (*Id*.)  Using the so-called "Beaufort number" for describing the effects of wind on land, Mr. Caldwell states that "[b]y no means are 25 mph maximum wind speeds considered 'high winds,' and exposure to 25 mph maximum wind speeds would not result in structural damage to brick veneer."  (*Id*.)  Regarding the drop in humidity on December 4, 2021, Mr. Caldwell acknowledged that the relative humidity on that date decreased by 63% over an 8 hour period but then provided several examples where "similar relative humidity decreases were observed in past years, without any failure or collapse of the brick

veneer."[11] (*Id.*) Thus, Mr. Caldwell opined that "the drop in relative humidity [on December 4, 2021] was not a 'rare weather phenomenon,' and had not caused the collapse of the brick veneer." (*Id.*)

Mr. Caldwell then disagreed with Mr. Patton's finding that rapid drying of the brick veneer played a role in causing the loss, explaining as follows:

> The claim that the "rapid drying" of the brick veneer, due to the decreased atmospheric relative humidity, "caused a contraction in the brick face separating the brick and mortar"; which had resulted in the collapse of the brick veneer is not grounded in recognized engineering and construction knowledge and practice, and had not been substantiated by any recognized industry standard, scientific methodology, analytical data, engineering calculations, or field documentation.

> Instead, the collapsed brick, and the displaced and bulged brick along the beam flanges, had been caused by the combination of the lack of proper/adequate anchorage between the brick veneer and the building structure, the lack of proper expansion joints in the brick veneer, the normal and typical expansion/contraction of the brick veneer, and the differential movement between the brick veneer and the steel beams.

(*Id.* at PageID#s 1180-1181.) Mr. Caldwell further disagreed with Mr. Patton's opinion that the structural steel beams and column did not play a role in the collapse, reiterating his detailed findings regarding the lack of proper anchorage and displaced/bulged brick as set forth in his (i.e., Caldwell's) December 2021 Report. (*Id.* at PageID#s 1181-1182.) In addition, Mr. Caldwell disagreed with Mr. Patton's opinion that there had been no previous maintenance issues or signs of water infiltration at the Property. (*Id.* at PageID#s 1182-1183.) To the contrary, Mr. Caldwell noted the horizontal caulking along the mortar joint of the southern wall, as well as the severe staining and discoloring of the "ledge [that] had formed between the adjacent courses of brick" on that wall. (*Id.* at PageID#

---

[11] These included (1) a 50% decrease in relative humidity from 88% to 38% on November 14, 2020; (2) a 51% decrease in relative humidity from 85% to 34% on November 6, 2019; and (3) a 52% decrease in relative humidity from 85% to 33% on December 19, 2018. (*Id.*)

23

1183.)  Lastly, Mr. Caldwell stated that he was unable to evaluate the lab analysis referenced in Mr. Patton's report because "[a]lthough requested by counsel, copies of any laboratory testing and analysis results of the mortar and brick, conducted by or through Patton Engineering, including any ASTM or other standard testing specifications used, have not been provided for review." (*Id.*)

## II.   Procedural History

As noted above, Plaintiff filed the instant action against Defendant in the Trumbull County Court of Common Pleas on November 28, 2023.  (Doc. No. 1-1.)  In the Complaint, Plaintiff alleges the following three claims:  (1) Breach of Contract (Count I); (2) Declaratory Judgment (Count II); and (3) Bad Faith (Count III).  (*Id.*)  Defendant removed the action to this Court on December 19, 2023 and filed its Answer on that same date. (Doc. Nos. 1, 3.) The Court conducted a Case Management Conference ("CMC") on February 28, 2024, during which it set various case management deadlines.  (Doc. No. 11.)

In April 2024, Defendant notified Plaintiff that it considered Mr. Hughes to be a fact witness and intended to subpoena him for "any and all documents relative to [his] investigation of the brick veneer/façade collapse at [the Property] that occurred on December 4, 2021, including but not limited to all documents relied upon for [his] engineering report on causation of the loss dated May 17, 2022; all communications between [him] and Irene Makridis and/or Dimitrios Makridis relative to the loss; and all documents relative to [his] inspection of the premises and determination of causation of the loss."  (Doc. No. 12.)  *See also* Doc. No. 12-1.  Plaintiff objected to the subpoena based on Fed. R. Civ. P. 26(b)(4)(D), claiming that Mr. Hughes was a consulting expert not expected to testify at trial and that any discovery from his was barred by privilege.  (Doc. No. 13.)

On April 25, 2024, Defendant filed a Position Paper raising the parties' dispute.  (Doc. No. 12.)  Defendant argued that the public disclosure of Mr. Hughes' Report in the Trumbull County Administrative Appeal "acted as a waiver of any protection under Fed. R. Civ. P. 26(b)(4)(D) which is intended for consultants whose reports and opinions are not to be disclosed under this rule."  (*Id.* at PageID# 206.)  In response, Plaintiff argued that Mr. Hughes was a consulting expert for purposes of Rule 26(b)(4)(D) and that his Report was "absolutely prepared because of actual litigation" and is therefore protected work product. (Doc. No. 13 at PageID# 242.)  Plaintiff further argued that, under Sixth Circuit precedent, there was no waiver simply because Plaintiff had disclosed Mr. Hughes' Report in the Trumbull County Administrative Appeal.  (*Id.*)  In sum, Plaintiff maintained that "the entire Hughes Report remains protected under [Rule 26(b)(3)] and, therefore, the subpoena for this material should not be issued."[12]  (*Id.* at PageID# 246.)

The Court referred the dispute to Magistrate Judge Reuben Sheperd for disposition.  (Doc. No. 14.)  On April 30, 2024, Magistrate Judge Sheperd issued an Order in which he found that "Defendant was precluded from serving the intended subpoena on Mr. Hughes by Rule 26(b)(4)." (Doc. No. 15.)  Magistrate Judge Sheperd explained as follows:

> ** I agree with Plaintiff. The timeline – which is undisputed by the parties – makes clear that Mr. Hughes was retained in anticipation of litigation. The building at issue suffered a collapse on December 4, 2021, Auto-Owners denied coverage on December

---

[12] In support of its Position Paper, Plaintiff submitted an Affidavit of Ms. Makridis dated April 24, 2024.  (Doc. No. 13 at PageID#s 247-249.)  Therein, Ms. Makridis avers that she hired Mr. Hughes "to confirm the building's structural integrity to the Warren Building Department and the Ohio Board of Building Appeals, as well as for potential use in any litigation with Auto-Owners."  (*Id.* at ¶ 13.)  She further avers that Mr. Hughes "was engaged specifically for litigation purposes with the Warren Building Department and with an eye towards litigation with Auto-Owners."  (*Id.* at ¶ 15.)  Ms. Makridis explains that "[h]iring Richard Hughes, P.E. was essential to prevent the building's demolition, and to prepare for the expected extensive litigation."  (*Id.* at ¶ 17.)  She avers that she later hired Mr. Smithberger to investigate the cause of the loss and that Mr. Smithberger has been identified (at that time) as the testifying expert at trial herein.  (*Id.* at ¶ 21.)  Ms. Makridis states that Mr. Hughes has not been identified as an expert herein.  (*Id.*)  As noted *supra*, Plaintiff subsequently decided not to use Mr. Smithberger as its expert, and retained Mr. Patton to serve as its testifying expert instead.

20, 2021, and by January 2022, the owner and 155 South Park, LLC were both engaged in legal proceedings both in the Trumbull County case as well as involved in the insurance coverage dispute underpinning this case. (ECF Doc. 13, PageID 247-48).  Mr. Hughes issued his report on May 17, 2022, and 155 South Park, LLC retained an attorney to pursue the insurance claim on June 23, 2022. (*Id*. at Page ID 248). Subsequently, Gene Smithberger, P.E. was retained as an expert in this case and issued a report on August 18, 2022. (*Id*.). It is Mr. Smithberger who is identified as the testifying expert at trial on behalf of 155 South Park, LLC. (*Id.*).

Because Mr. Hughes was retained in anticipation of litigation, because he is a consulting expert, and because he has not been identified as a testifying expert at trial, the work product protections of Rule 26(b)(4) apply. The materials and opinions underlying his report are not discoverable, and 155 South Park, LLC has not waived their protection. Defendant therefore may not issue the subpoena to Mr. Hughes.

(*Id*. at PageID#s 256-257.)  Defendant did not file an Objection to Magistrate Judge Sheperd's Order.

After several extensions of the case management deadlines, Defendant filed a Motion for Summary Judgment as to all of Plaintiff's claims on February 24, 2025.  (Doc. No. 27.)  Plaintiff filed a cross Motion for Summary Judgment with respect to each of its claims the following day. (Doc. No. 32.)  The parties filed Briefs in Opposition to each other's Motions, and Reply Briefs in support of their own Motions.  (Doc. Nos. 36, 40, 42, 44.)  Defendant also filed a Notice of Supplemental Authority in support of its Motion for Summary Judgment on April 17, 2025.  (Doc. No. 39.) Lastly, on April 21, 2025, Plaintiff filed a "Motion to Strike Exhibit B1 to Defendant's Motion for Summary Judgment [i.e., Mr. Hughes' May 17, 2022 Report] and Hearsay Contained in Defendant's Motion for Summary Judgment."  (Doc. No. 41.)  Defendant filed a Brief in Opposition on May 5, 2025, to which Plaintiff did not reply.  (Doc. No. 43.)

## III.    Motions to Strike

Prior to reaching the substantive arguments raised in the parties' cross Motions for Summary Judgment and related briefing, the Court will first address the parties' arguments that various documents offered in support of the pending Motions should be stricken.  *See Brainard v. American*

26

*Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions.")  Specifically, and as noted above, Plaintiff moves to strike Exhibit B1 to Defendant's Motion (i.e., the Hughes Report), as well as any references to the Hughes Report contained within Defendant's Motion.  (Doc. No. 41.)  In addition, in the body of its Brief in Opposition, Defendant moves to strike Exhibit 1 to Plaintiff's Motion for Summary Judgment "pursuant to Federal Rules of Civil Procedure 12(f) and 56(c)."  (Doc. No. 36 at PageID# 1340.)  Exhibit 1 to Plaintiff's Motion is a ten-page document entitled "Synopsis of Relevant Policy Language."  (Doc. No. 33 at PageID#s 1033-1041.)

### A.    Legal Standard

As a threshold matter, the Court notes that a "motion to strike" applies only to pleadings.  *See* Fed. R. Civ. P. 12(f).  "Pleadings" are enumerated in Fed. R. Civ. P. 7(a) and the list does not include affidavits, briefs, or exhibits. Therefore, a motion to strike is not the proper vehicle for attacking exhibits filed in support of, or in opposition to, motions for summary judgment.  *See Berry v. Citi Credit Bureau*, 2020 WL 6440490 at * 6 (W.D. Tenn. March 30, 2020) ("Courts in this district have consistently held that a motion to strike is not the proper device for countering exhibits or affidavits attached to memoranda in support of motions."), *adopted by*, 2020 WL 4596774 (W.D. Tenn. Aug. 11, 2020).  *See also Harper v. University of Toledo*, 2024 WL 1347296 at fn 8 (N.D. Ohio March 29, 2024); *Riveredge Dentistry Partnership v. City of Cleveland*, 2024 WL 639689 at * 6 (N.D. Ohio Feb. 15, 2024); *Stephenson v. Family Solutions of Ohio, Inc*., 2021 WL 795551 at * 5 (N.D. Ohio March 2, 2021).

Rather, in this context, "motions to strike should be construed as objections under Rule 56(c)(2)" of the Federal Rules of Civil Procedure. *Smith v. Interim HealthCare of Cincinnati, Inc.*, 2011 WL 6012971 at * 4 (S.D. Ohio Dec. 2, 2011). *See also* Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes) (explaining that the Rule 56(c)(2) objection "functions much as an objection for trial, adjusted for the pretrial setting... There is no need to make a separate motion to strike.") *See Stillwagon v. City of Delaware*, 274 F.Supp.3d 714, 736-737 (S.D. Ohio 2017); *Druhot v. Smith*, 2024 WL 1049838 at * 5-6 (S.D. Ohio March 11, 2024); *Artuso v. Felt*, 2022 WL 17960677 at *6 (N.D. Ohio); *Berry*, 2020 WL 6440490 at * 6. Accordingly, to the extent the parties ask this Court to strike various exhibits to the pending Summary Judgment Motions, the Court will construe Plaintiff's request as objections under Fed. R. Civ. P. 56(c)(2).

Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). After such an objection is properly raised, the burden is placed on the proponent of the supporting material to demonstrate that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *See, e.g., Mangum v. Repp*, 674 Fed. Appx. 531, 536-37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes)). *See also Riveredge Dentistry Partnership*, 2024 WL 639689at * 6. In evaluating an objection under Rule 56(c)(2), the Court "should disregard [inadmissible evidence] rather than striking it from the record." *Stephenson*, 2021 WL 795551 at *5. *See also Weisblat v. John Carroll University*, 2024 WL 4172597 at * 5 (N.D. Ohio Sept. 12, 2024).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting

28

*Beyene v. Coleman Sec. Servs., Inc*., 854 F.2d 1179, 1181 (9th Cir. 1988)).  For example, "hearsay evidence cannot be considered on a motion for summary judgment."  *Wiley,* 20 F.3d at 225-26.  When sustaining an objection, however, "the Court should use a scalpel, not a butcher knife" and excise only those portions that lack a proper foundation.  *Upshaw v. Ford Motor Co*., 576 F.3d 576, 593 (6th Cir. 2009).  *See also Antunes v. Gerdau MacSteel, Inc*., 2023 WL 3479401 at * 1-2 (6th Cir. May 16, 2023); *Johnson v. Donahoe,* 642 Fed. Appx 599, 602 (6th Cir. 2016); *Combs v. WalMart*, 2024 WL 555913 at * 3 (S.D. Ohio Feb. 12, 2024).

### B.    Analysis

#### 1.    Plaintiff's Motion to Strike the Hughes Report

As noted *supra*, Defendant attaches Mr. Hughes' May 17, 2022 Report (hereinafter "the Hughes Report") as an Exhibit to its Motion for Summary Judgment.  (Doc. No. 27-6.)  Defendant authenticates the Hughes Report via the Affidavit of Christopher Taneyhill.  (Doc. No. 27-5.)  Mr. Taneyhill avers that he is the Certified Building Official and Building Inspector for the City of Warren Building Department.  (*Id.*)  He avers that the Hughes Report attached to his Affidavit as Exhibit B1 is a true and accurate copy of that Report, and states that "the Hughes Report was submitted to the [Building Department] by Irene Makridis on behalf of 155 South Park LLC as part of the City of Warren's code enforcement case" relative to the Adjudication Order.  (*Id*.)  Mr. Taneyhill further avers that the Hughes Report is (1) "a record kept in the ordinary course of business as a regularly conducted activity of the [Building Department];" and (2) "a publicly available record relative to the [Building Department] files for the Subject Property."  (*Id*.)

Plaintiff argues that, by attaching the Hughes Report as an Exhibit to its Motion for Summary Judgment, Defendant is improperly attempting to circumvent Magistrate Judge Sheperd's April 30,

2024 Order.  (Doc. No. 41.)  Plaintiff emphasizes that Mr. Hughes was never intended to be an expert witness in the instant litigation and that, therefore, Judge Sheperd "quashed the notion of a subpoena being issued to Mr. Hughes, not only for his testimony but for his notes and opinions," on the basis of the work product doctrine.  (*Id*.)  Plaintiff further argues that the Hughes Report is hearsay and does not fall within any hearsay exception, including either Fed. R. Evid. 803(6)("Records of Regularly Conducted Activity") and/or 803(8) ("Public Records").  (*Id*.)

In response, Defendant argues that including the Hughes Report as an Exhibit does not circumvent Judge Sheperd's Order because Judge Sheperd did not rule that the Hughes Report itself was inadmissible.  (Doc. No. 43.)  Rather, Defendant maintains that Judge Sheperd's ruling "only pertained to the discoverability of the materials and opinions underlying this report, and ruled that they were not discoverable."  (*Id*. at PageID# 1429.)  Although acknowledging that Mr. Hughes is not Plaintiff's testifying expert, Defendant asserts that it properly attached the Hughes Report to its Motion because Plaintiff waived any work product protection with respect to this Report by filing it on the public docket as part of its litigation with the City of Warren.  (*Id*. at PageID# 1430.)

Defendant next argues that the Hughes Report is not hearsay because it constitutes a statement by a party-opponent under Fed. R. Evid. 801(d)(2).  (*Id*.)  In support of this assertion, Defendant cites Ms. Makridis' Affidavit (Doc. No. 41-1) in which she expressly avers that she retained Mr. Hughes to opine regarding the cause of the loss and authorized him to issue his Report so that it could be used in Plaintiff's litigation with the City of Warren.  (*Id.*)

Defendant then argues that, even if the Hughes Report is considered hearsay, it is nonetheless admissible under several different hearsay exceptions.  (Doc. No. 43 at PageID#s 1432-1435.)  Defendant notes that, because Judge Sheperd's Order effectively barred Defendant from deposing

30

Mr. Hughes, Mr. Hughes is an unavailable witness under Fed. R. Evid. 804(a)(1). (*Id.*) Defendant maintains that the Hughes Report therefore falls under the exception to hearsay under Fed. R. Evid. 804(b)(5), which defaults to the Residual Exception for hearsay in Fed. R. Evid. 807. (*Id.*) Defendant argues that the Hughes Report is admissible under Rule 807 because it is supported by sufficient guarantees of trustworthiness and is probative of several issues in this case. (*Id.*) Lastly, Defendant argues that Mr. Taneyhill's Affidavit demonstrates that the Hughes Report also qualifies for both the public records hearsay exception in Rule 803(8) and the business records exception in Rule 803(6). (*Id.*) Although it could have done so under this Court's Local Rules, Plaintiff did not file a Reply Brief in support of its Motion to Strike.

The Court will address the parties' arguments regarding whether the Hughes Report is inadmissible work product and/or hearsay separately, below.

### a. Work Product

For the following reasons, the Court finds that Plaintiff waived any work product protection with respect to the Hughes Report. As an initial matter, the Court rejects Plaintiff's contention that Judge Sheperd found that the Hughes Report *itself* is protected by work product. In his April 2024 Order, Judge Sheperd found that Plaintiff retained Mr. Hughes in anticipation of litigation and that, therefore, "the materials and opinions *underlying* his report are not discoverable and 155 South Park LLC has not waived their protection." (Doc. No. 15 at PageID# 257) (emphasis added). This Court does not construe Judge Sheperd's Order as concluding that Plaintiff did not waive work product protections with respect to the Hughes Report itself. Moreover, upon its own review, this Court finds that Plaintiff did, in fact, waive work product protection over the Hughes Report by voluntarily disclosing it and making it part of the public record in the Trumbull County Administrative Appeal.

31

The work-product doctrine applies to documents "prepared in anticipation of litigation."  Fed. R. Civ. P. 26(b)(3).  The protection ensures that an attorney may "assemble information, sift ... the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."  *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).  Work-product protection applies if the company or counsel created the documents "because of" a party's "reasonable" anticipation of litigation, as opposed to its ordinary business purposes.  *In re Professionals Direct Ins. Co*., 578 F.3d 432, 439 (6th Cir. 2009) (quotation omitted).  *See also In re First Energy Corporation*, 154 F.4th 431, 437 (6th Cir. Oct. 3, 2025).

It is well established, however, that a party may waive the protections of the work product privilege.  *See In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289, fn 24 (6th Cir. 2002).  Specifically, the Sixth Circuit has held that parties "generally waive work-product protection by voluntarily disclosing the substance of protected communications to any adversary."  *See In re First Energy Corporation*, 154 F.4th 443.  *See also In re Columbia,* 293 F.3d at 306 & fn, 28; *Schnatter v. 247 Group, LLC*, 2021 WL 5018741 at * 3 (W.D. Ky. Oct. 28, 2021) (noting that the work product privilege "is not absolute" and "can be waived by a disclosure that 'substantially increases the opportunity for potential adversaries to obtain the information.'") (quoting *EEOC v. Wal-Mart Stores, Inc*., 2008 WL 11344709 at * 4 (E.D. Ky. Feb. 19, 2008)).  As one district court explained, "[w]hen work product is disclosed to a third party, the key issue becomes whether 'the material is disclosed in a manner inconsistent with keeping it from an adversary....'" *American Municipal Power, Inc. v. Voith Hydro, Inc*., 2021 WL 5917096 at * 3 (S.D. Ohio Dec. 14, 2021) (quoting *In re Chevron*, 633 F.3d 153, 165 (3rd Cir. 2011)).

Here, the record is clear that Plaintiff disclosed the Hughes Report to an adversary (i.e., the City of Warren) in the Trumbull County Administrative Appeal. As discussed above, the state court record reflects that, in Plaintiff's Trumbull County Administrative Appeal, Mr. Taneyhill filed a Motion for Temporary and Permanent Injunction against Plaintiff. In response, Plaintiff filed a Brief in Opposition which attached the Hughes Report as an Exhibit. (Doc. No. 12-3.) In addition, Mr. Taneyhill expressly avers that Ms. Makridis, on behalf of Plaintiff, submitted the Hughes Report to the City of Warren's Building Department "as part of the City's code enforcement case." (Doc. No. 27-5 at ¶ 6.) In her deposition herein, Ms. Makridis authenticated the Hughes Report; acknowledged that Plaintiff had filed it in the Trumbull County Administrative Appeal; and agreed that it was "part of the [state] Court's record." (Doc. No. 26-1 at Tr. 72-73, 75-76.)

By submitting the Hughes Report as part of the public record in the Trumbull County Administrative Appeal, Plaintiff not only voluntarily disclosed it to its direct adversary in those proceedings (i.e., the City of Warren), but also disclosed it "in a manner inconsistent with keeping it from" its adversary in the instant proceedings—i.e., Auto-Owners. *American Municipal Power, Inc.*, 2021 WL 5917096 at * 3. Indeed, Mr. Steinbeck avers that all Defendant needed to do in order to obtain the Hughes Report was submit a public records request to the City of Warren Building Department.[13] (Doc. No. 27-1 at ¶ 17.) *See Schnatter, LLC*, 2021 WL 5018741 at * 3 (noting that the work product privilege "can be waived by a disclosure that 'substantially increases the opportunity for potential adversaries to obtain the information.'")

---

[13] As noted above, Mr. Taneyhill confirms that the City maintained a copy of the Hughes Report in its files relating to the Adjudication Order enforcement case relating to the Property. (Doc. No. 27-5 at ¶¶ 6-8.)

33

Accordingly, and in light of the above, the Court rejects Plaintiff's arguments that (1) it did not waive work product protection relating to the Hughes Report itself; and (2) that Defendant improperly "circumvented" Judge Sheperd's Order by attaching the Hughes Report to its summary judgment briefing.

### b.     Hearsay

Plaintiff next argues (summarily) that the Court should disregard the Hughes Report because it is inadmissible hearsay.  (Doc. No. 41.)  Hearsay is defined in Fed. R. Evid. 801(c) as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies for an exception or exclusion provided by a federal statute, the federal rules of evidence, or a Supreme Court rule.  Fed. R. Evid. 802.

Here, Defendant first argues that the Hughes Report does not constitute hearsay because it is a statement by an opposing party under Rules 801(d)(2)(A), (C), and/or (D).  (Doc. No. 43 at PageID#s 1430-1431.)   Those Rules provide as follows:

> **(d) Statements That Are Not Hearsay**. A statement that meets the following conditions is not hearsay:
>
> **
>
> **(2) An Opposing Party's Statement**. The statement is offered against an opposing party and:
>
> > (A) was made by the party in an individual or representative capacity;
> >
> > **
> >
> > (C)  was made by a person whom the party authorized to make a statement on the subject;

(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; **

The statement must be considered but does not by itself establish the declarant's authority under (C); [or] the existence or scope of the relationship under (D);

Fed. R. Evid. 801(d)(2). "Admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility." *Nowell v. City of Cincinnati*, 2006 WL 2619846 at * 6 (S.D. Ohio Sept. 12, 2006) (citing Fed. R. Evid. 801 advisory committee note) (stating that "[n]o guarantee of trustworthiness is required in the case of an admission.")

Although Rules 801(d)(2)(A), (C), and (D) are separate subsections which involve separate elements and proof, Defendant does not cite any legal authority in support of its arguments that any of these subsections apply.  (Doc. No. 43.)  Rather, Defendant argues generally that Ms. Makridis' Affidavit (Doc. No. 41-1) shows that Plaintiff retained Mr. Hughes to investigate the cause of the loss, and authorized him to issue the Hughes Report for use in the Trumbull County Administrative Appeal.  (Doc. No. 43 at PageID# 1431.)  Defendant asserts (summarily) that the Hughes Report is, therefore, a "statement of [Mr. Hughes'] findings in his representative capacity/agency as an engineer for Plaintiff in the occupancy litigation,."  (*Id*.)  Defendant further argues that "this statement was made while Mr. Hughes was acting within his hired scope as investigating engineer as Plaintiff/Mrs. Makridis made the effort to submit it as part of the occupancy litigation."  (*Id.*)

Plaintiff did not file a Reply Brief or otherwise offer any response to this argument.  It is well established that, if a party fails to respond or to otherwise oppose an argument raised in summary judgment briefing, a district court may deem that party to have waived opposition.  *See, e.g., Adkins v. Marathon Petroleum Co., LP*, 105 F.4th 841, 854 (6th Cir. 2024) ("[A]t the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the moving party's

arguments.")(citation omitted). *See also Bennett v. Hurley Med. Ctr.,* 86 F.4th 314, 324 (6th Cir. 2023). Here, despite having every opportunity to file a Reply Brief or otherwise respond to this argument, Plaintiff failed to do so. The Court, therefore, deems Plaintiff to have waived any opposition with respect to the issue of whether the Hughes Report constitutes a statement of a party-opponent under Rule 801(d)(2).

Nonetheless, even if Plaintiff had not waived this issue, the Court would find that the Hughes Report is not hearsay. As an initial matter, and although not raised by either party, the Court finds that, to the extent Defendant relies on the Hughes Report to demonstrate that Plaintiff failed to comply with the Policy's cooperation clause and/or clause against fraud and intentional concealment, the Hughes Report does not constitute hearsay because it is not being offered for the truth of the matter asserted therein.

In its summary judgment briefing, Defendant relies on Plaintiff's failure to provide Defendant with a copy of the Hughes Report to demonstrate that Plaintiff: (1) failed to cooperate with Defendant's investigation of the claim, in violation of Section E(3)(a)(8) of the "Building and Personal Property Coverage Form" (Doc. No. 1-1 at PageID# 80); and (2) intentionally concealed information relevant to the claim, in violation of Section A of the "Commercial Property Conditions" of the Policy (*Id*. at PageID# 113.) (Doc. No. 27 at PageID#s 676-677.) To the extent that the Hughes Report is offered for this purpose, the Court finds that it is not being offered "to prove the truth of the matter asserted in the statement," for purposes of Rule 801(c). Rather, in connection with this argument, Defendant is offering the Hughes Report for the sole purpose of showing the existence of information relevant to Plaintiff's claim that was in Plaintiff's possession but not disclosed by

Plaintiff to Defendant.  Thus, to the limited extent that Defendant offers the Hughes Report for this purpose, the Court finds that it is does not meet the definition of hearsay under Rule 801(c).

The Court recognizes, however, that Defendant also offers the Hughes Report in support of its argument that there is no coverage for the December 4, 2021 loss because one or more of the Policy's exclusions apply.  To the extent Defendant offers the Hughes Report for this purpose, it is arguably being offered for the truth of the matter asserted therein within the meaning of Rule 801(c).  Nonetheless, the Court finds that Defendant has demonstrated that the Hughes Report satisfies Rule 801(d)(2)(D).  To qualify as a statement of a party-opponent under Rule 801(d)(2)(D), the testimony must be (1) a statement and (2) made concerning a matter within the scope of the declarant's agency or employment relationship.  *See Nowell,* 2006 WL 2619846 at * 5 (citing *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003)).   While this Rule often arises in the employment context (i.e., whether statements by employees, supervisors, managers, etc. constitute party-opponent statements), it is not limited to that context.  As one commentator explained:

> Outside the context of employee complaints, courts typically take an unabashedly broad view of Rule 801(d)(2)(D)'s application, emphasizing that qualifying statements must simply touch on matters that fall within the employee or agent's general duties and responsibilities. Stated another way, "an employee need only be performing the duties of his employment when he comes in contact with the particular facts at issue." Importantly, the statements must still concern matters related to the speaker's employment.  Consequently, statements from an accident investigator about the likely cause of a crash he investigated could be introduced against his employer under Rule 801(d)(2)(D). Similarly, "[c]omments made by an operator of a vehicle or machine about the actions he took in the course of his job also qualify." The fact that an employer might later claim to disagree with or have generally forbidden certain statements does not mean that those statements cannot still qualify for admission under Rule 801(d)(2)(D).

30B Wright & Miller, Federal Practice & Procedure Evid. § 6776 (2025 ed.) (footnotes omitted).  The Sixth Circuit has explained that, under this Rule, there is no requirement to show that the declarant

had the authority to make the statement. *See Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir. 1983). *See also* 30B Wright & Miller, Federal Practice & Procedure Evid. 6776 (2025 ed.) (Rule 801(d)(2)(D) "'requires neither adoption nor ratification' of the statements by the party. All that is required is that the agent or employee made the statements during and within the scope of the agency or employee relationship.") (internal quotations omitted).

Here, Ms. Makridis avers that she "retained Richard Hughes to investigate the cause of collapse and assess the structural integrity of the building." (Doc. No. 41-1 at ¶ 8.) She avers that "[h]is engagement was temporary and solely for the purpose of maintaining occupancy and avoiding the disruption of my law practice." (*Id*. at ¶ 9.) Ms. Makridis then avers that she "did not find Mr. Hughes' findings to be credible or persuasive." (*Id.* at ¶ 10.) Nonetheless, and despite whatever concerns she now claims she has with Mr. Hughes' findings, Ms. Makridis acknowledged in deposition that she (1) hired Mr. Hughes to investigate the loss on behalf of Plaintiff, including the cause of the loss; (2) represented to the state court that Mr. Hughes was Plaintiff's expert;[14] and (3) filed the Hughes Report in state court in support of her administrative appeal from the OBBA's affirmance of the Adjudication Order. (Doc. No. 26-1 at Tr. 72-76.)

Based on the above (and in the absence of any opposition from Plaintiff), the Court finds that Defendant had come forward with sufficient evidence to demonstrate, for purposes of this Opinion only, that the Hughes Report is a statement by a party-opponent under Rule 801(d)(2)(D) because it that was made by Plaintiff's agent or employee (i.e., Mr. Hughes) on a matter within the scope of that

---

[14] Although Plaintiff's counsel appears to have objected to Defendant's question during deposition regarding whether Plaintiff retained Mr. Hughes to investigate the cause of the loss (Doc. No. 26-1 at Tr. 76), the Court notes that Ms. Makridis subsequently expressed averred that she "initially retained Richard Hughes to *investigate the cause of the collapse* and assess the structural integrity of the building." (Doc. No. 44-1 at ¶ 8) (emphasis added).

relationship and while that relationship existed. Accordingly, the Court concludes, for summary judgment purposes only, that the Hughes Report is not hearsay for the reasons set forth above.[15]

The Court further finds that, even assuming *arguendo* the Hughes Report is hearsay, it would be admissible under the residual hearsay exception set forth in Fed. R. Evid. 807. As noted above, Defendant argues that Mr. Hughes is an unavailable witness under Fed. R. Evid. 804(a)(1) because "an attempt by Auto-Owners to have Mr. Hughes authenticate his report .... was precluded by" Judge Sheperd's Order finding that Mr. Hughes' testimony was protected work product. (Doc. No. 43 at PageID# 1432.) Defendant maintains that the Hughes Report falls under the exception to hearsay under Fed. R. Evid. 804(b)(5), which defaults to the Residual Hearsay Exception in Fed. R. Evid. 807. (*Id*.) Defendant argues that the requirements for admission under Rule 807 are met because (1) "there is an ample amount of evidence to support the trustworthiness of the Hughes Report;" and (2) the Hughes Report is probative because it is directly relevant to Plaintiff's failure to cooperate and to the cause of the loss. (*Id.* at PageID# 1433.)

Plaintiff did not file a Reply to Defendant's Brief in Opposition and, therefore, has failed to acknowledge, address, or otherwise oppose Defendant's argument that the Hughes Report is admissible under Rule 807. The Court, therefore, deems Plaintiff to have waived any opposition with respect to the issue of whether the Hughes Report is admissible under Rule 807. *See, e.g., Adkins*, 105 F.4th at 854; *Bennett,* 86 F.4th at 324. Nonetheless, even if Plaintiff had not waived this issue, the Court would find that the Hughes Report is admissible because (for purposes of the instant

---

[15] Because the Court finds that the Hughes Report does not constitute hearsay for the reasons set forth above, the Court need not (and does not) address Defendant's arguments that the Hughes Report satisfies Rules 801(d)(2)(A) and/or (C).

summary judgment briefing) (1) Mr. Hughes is an unavailable witness under Rule 804; and (2) the Hughes Report qualifies for admission under Rule 807.

Rule 804 provides a series of hearsay exceptions that can only be invoked when the declarant is "unavailable." *See* 30B Fed. Prac. & Proc. Evid. § 6962 (2025 ed.)  Under Rule 804(a)(1), "[a] declarant is considered to be unavailable as a witness if the declarant:  (1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies." Fed. R. Evid. 804(a)(1).  In order to fit within this definition, "[a] ruling by the judge is required, which clearly implies that an actual claim of privilege must be made."  Adv. Committee Notes to Fed. R. Evid. 804(a).  The burden of proving the unavailability of a witness under Rule 804(a) rests with the proponent of the hearsay evidence.  *United States v. Acosta*, 769 F.2d 721, 723 (11th Cir. 1985).

Here, Defendant argues (and Plaintiff does not contest) that Mr. Hughes was exempted from testifying in deposition about his Report because Judge Sheperd issued an Order finding that his testimony was barred by the work product privilege.  Thus, and in the absence of any meaningful argument to the contrary, the Court finds (for purposes of the instant summary judgment briefing only) that Mr. Hughes is an "unavailable" witness under Rule 804(a)(1).[16]

Rule 804(b) then provides a series of hearsay exceptions for unavailable witnesses. Defendant argues that the Hughes Report is admissible under the residual hearsay exception, which was formerly Rule 804(b)(5) and later transferred to Rule 807.  Rule 807 provides, in relevant part, as follows:

---

[16] The Court emphasizes that this finding is limited to the instant summary judgment proceedings.  Indeed, although not raised or argued by the parties herein, the Court notes that, in light of this Court's conclusion that Plaintiff waived work product protection as to the Hughes Report, Mr. Hughes would not necessarily be prevented from testifying at trial.

(a) <u>In General</u>. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:

(1) the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807. [17]   The proponent of the hearsay testimony bears the burden of proving that it fits

within Rule 807's residual hearsay exception.  *See United States v. Kendrick*, 853 F.2d 492, 496 n.3

---

[17] As the Sixth Circuit has explained, "Rule 807 allows the admission of a hearsay statement that does not fall under the exceptions to hearsay found in Rules 803 and 804." *Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013). *See also United States v. Laster*, 258 F.3d 525, 530 (6th Cir. 2001). Here, the only other hearsay exceptions relied on by Defendant are the business records exception in Rule 803(6) and the public records exception in Rule 803(8). For the following reasons, the Court finds that Defendant has not demonstrated that the Hughes Report is admissible under either of these exceptions.

To be admissible under Rule 803(6), a record must meet the following four requirements: "(1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). *See also Fambrough v. Wal-Mart Stores, Inc.*, 611 Fed. Appx. 322, 326 (6th Cir. 2015). "This information must be presented through 'the testimony of the custodian or other qualified witness[.]'" *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003). The Sixth Circuit has held that "Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record." *Jenkins*, 345 F.3d at 935. However, the custodian must be "familiar with the company's recordkeeping practices." *Id. See also Fambrough*, 611 Fed. Appx. at 326. Here, Mr. Taneyhill avers that the Hughes Report was submitted to the Building Department by Ms. Makridis "as part of 'the City's code enforcement case and that the Report is a "record kept in the ordinary course of business as a regularly conducted activity of the [Building Department]." (Doc. No. 27-5 at PageID#s 711-712.) Notably, however, Mr. Taneyhill does not aver that he is familiar with the Building Department's recordkeeping practices. (*Id.*) Thus, Mr. Taneyhill's Affidavit fails to lay a sufficient foundation for admission of the Hughes Report under Rule 803(6). *See, e.g., Fambrough*, 611 Fed. Appx. at 326-329.

Rule 803(8) provides that a "record or statement of a public office" is admissible as non-hearsay if: " (A) [I]t sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report,....; or (iii) in a civil case...., factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). The Advisory Committee Notes explain that the "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." *Id*. Adv. Comm. Note (8). Here, Defendant argues that the Hughes Report is admissible under Rule 803(8) because "Mr. Hughes' investigation and findings were conducted pursuant to the Building Department of Adjudication Order No. 21-1204 and code enforcement case No. 1613." (Doc. No. 43 at PageID# 1434.) Defendant's "argument" is entirely without merit. First, Defendant fails at any point to explain whether it believes the Hughes Report is admissible under Rule 803(8)(A)(i), (ii) and/or (iii). Nor does Defendant make

(6th Cir. 1988) ("[T]he proponent of a hearsay statement bears the burden of proving that the statement fits squarely within a hearsay exception or exclusion."); *Johnson v. Adams*, 2021 WL 6125850 at * 15 (E.D. Mich. Dec. 28, 2021).

As a general rule, the residual hearsay exception should be used rarely and only in extraordinary circumstances. *See Johnson*, 2021 WL 6125850 at * 15. *See also Deere & Company v. FIMCO Inc.,* 260 F.Supp.3d 830, 840 (W.D. Ky. 2017); 30B Fed. Prac. & Proc. § 7066 (2025 ed.). Nonetheless, "'[d]istrict courts have considerable discretion in applying the residual exception to the hearsay rule[.]'" *Johnson*, 2021 WL 6125850 at * 15 (citation omitted). *See also United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016) ("Trial courts have a 'considerable measure of discretion' in determining whether evidence should be admitted under Rule 807.")

Here, Defendant argues (and Plaintiff does not contest) that the Hughes Report is supported by sufficient guarantees of trustworthiness because (1) Mr. Taneyhill avers that it was given to the Building Department by Ms. Makridis to support her position in the code enforcement case; and (2) Ms. Makridis submitted the Hughes Report "to the Trumbull County Court of Common Pleas to accurately represent to the tribunal her position on the occupancy litigation appeal." (Doc. No. 43 at PageID#s 1432-1433.) Defendant thus maintains that Ms. Makridis (on Plaintiff's behalf) "has set forth [the Hughes Report's] trustworthiness." (*Id.*)

---

any reasoned argument (or cite any supporting authority) that the Hughes Report would in fact satisfy any of these subsections. Specifically, Defendant makes no argument that the Hughes Report "sets out the [public] office's activities" under Rule 803(8)(A)(i) or that it sets out "a matter observed while under a legal duty to report" under Rule 803(8)(A)(ii). Finally, Defendant fails to sufficiently argue or demonstrate that the Hughes Report sets out "factual findings from a legally authorized investigation" under Rule 803(8)(A)(iii). In sum, Defendant's briefing on this issue is totally deficient. The Court therefore finds that Defendant has failed to show that the Hughes Report qualifies for admission as a public record under Rule 803(8).

The Sixth Circuit has recognized that "[t]here is a lack of Sixth Circuit case law on the residual exception's trustworthiness requirement outside of the context of the Confrontation Clause...." *Brumley*, 727 F.3d at 578.  "Most courts apply a '[b]road inquiry,' looking to the totality of the circumstances that surround the statement when determining whether it possesses the requisite guarantees of trustworthiness." *Wright v. Beard*, 2016 WL 7173787 at * 5 (W.D. Ky.  Dec. 8, 2016) (citation omitted).  *See also Johnson*, 2021 WL 6125850 at * 15.  "In assessing the totality of the circumstances, the Court may consider the declarant's relationship to the parties, the motive of the declarant in making the statement, the extent to which the statement reflects the declarant's personal knowledge, and the consistency of any past statements by the declarant." *Hobart Corp. v. Dayton Power & Light Co*., 2020 WL 614698 at *2 (S.D. Ohio Feb. 10, 2020).  *See also Johnson*, 2021 WL 6125850 at * 15.

Here, Plaintiff does not dispute that the Hughes Report is supported by sufficient guarantees of trustworthiness.  As Defendant correctly notes, Ms. Makridis (on behalf of Plaintiff) retained Mr. Hughes to author the Report and then provided copies of it to both the Building Department and the state court in support of Plaintiff's position in the code enforcement proceedings.  Although Ms. Makridis now states that she disagrees with Mr. Hughes' findings regarding the cause of the loss, Plaintiff does not argue (and there is nothing in the record to suggest) that that the Hughes Report is not trustworthy.[18]  Accordingly, and based on the lack of opposition, the Court finds that the Hughes Report is supported by sufficient guarantees of trustworthiness under Rule 807(a)(1).

---

[18] The Court notes that the Hughes Report is signed by Mr. Hughes and contains his seal as a registered professional engineer.  (Doc. No. 27-6 at PageID# 713.)  In addition, in the Report, Mr. Hughes summarizes his investigation of the loss, describes the materials he reviewed, and sets forth his conclusions.  Mr. Hughes also attaches to his Report a detailed sketch of the loss as well as numerous photos of the Property.  Plaintiff does not direct this Court's attention to any evidence (either in or relating to the Report) to suggest that it is not supported by sufficient guarantees of trustworthiness.

Although a closer call, the Court also finds that the Hughes Report is "more probative on the point on which it is offered than any other evidence" that Defendant can obtain through reasonable efforts, under Rule 807(a)(2).  Defendant argues (and Plaintiff does not dispute) that the Hughes Report is probative to showing that (1) Plaintiff failed to meet its duty of cooperation; and (2) Plaintiff's own retained expert evaluated the cause of the loss and agreed with the findings of Mr. Caldwell regarding causation.  (Doc. No. 43 at PageID# 1433.)  While Ms. Makridis did offer some (reluctant) testimony regarding these issues, the Court finds that the Hughes Report is more probative evidence on these issues at the summary judgment stage.  Accordingly, and in the absence of any opposition, the Court finds that the Hughes Report satisfies the probative requirement set forth in Rule 807(a)(2) for purposes of this Opinion.

Therefore, and for all the reasons set forth above, the Court finds that the Hughes Report is admissible for purposes of these summary judgment proceedings.  Plaintiff's Motion to Strike the Hughes Report is denied.

### 2.  Exhibit 1 to Plaintiff's Motion for Summary Judgment

In its Brief in Opposition to Plaintiff's Motion for Summary Judgment, Defendant moves to strike Exhibit 1 to Plaintiff's Motion.  (Doc. No. 36 at PageID# 1340.)  As noted above, Exhibit 1 is a nine-page document entitled "Synopsis of Relevant Policy Language."  (Doc. No. 33 at PageID#s 1033-1041.)  The first four pages consist of a typewritten outline, reproduction, and discussion of the relevant Policy language.  (*Id*. at PageID#s 1033-1036.)  The last four pages appear to be certain pages from Policy Declarations pages.  (*Id*. at PageID#s 1037-1041.)  Defendant argues that Exhibit 1 should be stricken because it "was not authenticated through deposition testimony, an affidavit, or

44

anything in the record."  (Doc. No. 36 at PageID# 1340.)  Defendant also suggests that Exhibit 1 is an improper attempt to circumvent the page limitations in Local Rule 7.1(f).  (*Id.*)

Plaintiff does not acknowledge or address Defendant's request to strike Exhibit 1 in its Reply Brief (Doc. No. 42) but does address it in its Brief in Opposition to Defendant's Motion for Summary Judgment.  (Doc. No. 40 at PageID#1387.)  Therein, Plaintiff's counsel states that Exhibit 1 was "prepared by the undersigned as means of simplifying the application of the relevant parts of the Policy."  (*Id.*)  In order "to dispose with further briefing on the issue...." and in an apparent attempt to defuse any arguments that Plaintiff was improperly circumventing page limits, Plaintiff then restates the pertinent provisions of the Policy in its Brief in Opposition.  (*Id.* at PageID#s 1387-1390.)

The Court will disregard Exhibit 1 to Plaintiff's Motion for Summary Judgment.  Plaintiff does not cite (and this Court is not aware of) any authority suggesting that it is appropriate to attach a "synopsis" created by counsel as an Exhibit to its Motion for Summary Judgment.  Moreover, while the Court does not believe Plaintiff's counsel intended to circumvent page limitations, the fact remains that, by attaching a "synopsis" of the relevant Policy language to its Motion in lieu of discussing that language in the Motion itself, Plaintiff gained the advantage of additional space in its Motion to present its legal arguments.  Regardless of the motivation, the Court finds that this is not appropriate, or fair to Defendant.

Accordingly, the Court will disregard Exhibit 1 to Plaintiff's Motion for Summary Judgment.

## IV.    Cross Motions for Summary Judgment

### A.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.,* 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.,* 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC*

46

*Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

Here, the parties have filed cross-motions for summary judgment. "Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Peters v. DCL Medical Laboratories, LLC*, 305 F.Supp.3d 799, 814 (S.D. Ohio 2018). "The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion." *Id*. Rather, in reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *See Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *Allstate Vehicle and Property Ins. Co. v. Hoffa,* 566 F.Supp.3d 816, 820-821 (S.D. Ohio 2021); *Peters,* 305 F.Supp.3d at 814.

**B.    Analysis**

As noted above, in its Complaint, Plaintiff alleges the following three claims: (1) Breach of Contract (Count I); (2) Declaratory Judgment (Count II); and (3) Bad Faith (Count III). (Doc. No. 1-1.) Plaintiff and Defendant cross move for summary judgment as to each of Plaintiff's claims. The Court will address the parties' arguments separately below.

**1.    Breach of Contract (Count I)**

In Count I, Plaintiff alleges that Defendant breached its "contractual duty to pay [Plaintiff] its damages sustained because of [the December 4, 2021] collapse." (Doc. No. 1-1 at PageID# 9.)

Plaintiff asserts that Defendant "has also breached its obligations to [Plaintiff] by not providing coverage for Plaintiff's loss of use of the building and not paying for any loss of income from the building or for Plaintiff's damages in having to rent additional space with which to operate."  (*Id.*)  Plaintiff alleges that, as a result of Defendant's breach, it has been damaged in the amount of no less than $360,000.  (*Id.*)

Plaintiff argues that it is entitled to summary judgment in its favor with respect to this Count because the damages it sustained on December 4, 2021 constitute a "direct physical loss" and the loss is, therefore, a Covered Cause of Loss under the Policy.  (Doc. No. 32.)  Plaintiff asserts that neither the Wear and Tear nor Collapse Exclusions apply because the loss at issue constitutes a "specified cause of loss," i.e., it was caused by windstorm and water damage.  (*Id.*)  Plaintiff further maintains that the Policy's Additional Coverage - Collapse ("ACC") provision provides an independent basis for coverage because the loss constitutes an abrupt collapse that rendered the building unusable for its intended purpose and was caused by hidden decay.  (*Id.*)  Plaintiff argues that the opinion of its testifying expert, Mr. Patton, fully supports its position that it is entitled to coverage under the Policy, and that Mr. Caldwell's opinion is fundamentally flawed and based upon "building codes that were not in existence at the time of construction" of the Property.  (*Id.*)

Defendant argues that there is no genuine issue of material fact that it is entitled to summary judgment in its favor with respect to this claim.  (Doc. No. 27.)  Relying heavily on Mr. Caldwell's expert opinions, Defendant argues that Plaintiff's claimed damages are clearly excluded under both the Wear and Tear and Collapse Exclusions because the December 4, 2021 loss was caused by defective workmanship relative to a lack of proper anchorage between the brick veneer and the building's structure, which led to rust, decay, settling, cracking, shrinking or expansion of the brick

48

veneer that caused the collapse. (*Id.*) Defendant further asserts that the ACC does not apply because it requires an "abrupt falling down" caused by hidden decay, whereas "the overwhelming evidence in this case shows that there was nothing 'hidden' about the deterioration and decay of the Property before the loss." (*Id.*at PageID# 673.)

Defendant maintains that Mr. Patton's expert opinions do not create a fact issue because (1) "any testimony from Mr. Patton stating that the cause of the loss was due to weather conditions is still excluded by the Policy;" and (2) Mr. Patton did not make any expert findings relative to hidden decay necessary for the ACC to apply. (*Id.* at PageID#s 673-674.) And even if it could be shown that the loss was the result of an "abrupt collapse" that was caused by hidden decay, Defendant argues that Plaintiff still failed to meet the requirements of coverage under the ACC provision because Plaintiff continued to occupy the premises for its intended purpose for several months after the loss. (*Id.* at PageID# 675.) Lastly, Defendant argues that it is entitled to judgment in its favor with respect to this claim for the independent reason that Plaintiff breached its duty of cooperation under the Policy and withheld information vital to the claim. (*Id.* at PageID#s 676-677.)

The Court will begin by addressing Defendant's argument it is entitled to judgment in its favor because Plaintiff failed to cooperate with Defendant's investigation of the claim, and/or intentionally concealed information relevant to the claim.

### a.     Cooperation and Fraud/Intentional Concealment

Defendant argues that coverage under the Policy is void because Plaintiff failed to cooperate and/or engaged in fraud/intentional concealment when it failed to provide the Hughes Report to Defendant. (Doc. No. 27 at PageID#s 676-677.) Defendant asserts it is undisputed that it made multiple requests to Plaintiff for all documentation relevant to the claim but that Plaintiff nonetheless

49

failed to either disclose that Mr. Hughes had conducted an engineering assessment of the Property or provide Defendant with a copy of the Hughes Report. (*Id*.) Defendant argues that "Plaintiff's failure to provide the Hughes Report to Auto-Owners shows a clear failure of Plaintiff's duty to cooperate and thus a failure of Plaintiff's obligations under the Policy and impeded Auto-Owner's ability to fully investigate the claim." (*Id*.) Defendant further asserts (summarily) that "this non-production of the Hughes Report indicates an act of concealment of relevant information to Auto-Owner's investigation, warranting voiding coverage." (*Id*.)

In response, Plaintiff insists (incorrectly) that there is no cooperation clause in the Policy at issue. (Doc. No. 40 at PageID# 1398; Doc. No. 42 at PageID# 1417-1418.) Even assuming that there is a cooperation clause, Plaintiff argues that Defendant's argument fails because, in order to constitute a defense to liability, lack of cooperation must result in a material and substantial prejudice to the insurance company. (*Id*.) Plaintiff argues that there is no material and substantial prejudice here because (1) "there was simply no duty to provide a report of a non-testifying expert;" and (2) "Defendant actually obtained the report long before litigation ensued." (*Id*. at PageID# 1399.) Plaintiff further emphasizes that Defendant was given "unfettered access" to the Property; that its expert and adjusters "were able to examine the building at will;" and that Plaintiff provided "whatever maintenance records [it] had." (*Id.*; Doc. No. 42 at PageID# 1417.) Thus, Plaintiff maintains, "a finding of material prejudice is simply nonsensical." (Doc. No. 40 at PageID# 1399.)

In its Reply Brief, Defendant notes that the Policy does, in fact, include a cooperation clause "that is listed as a specific condition to coverage under the 'Loss Conditions' Section of the Building and Personal Property Coverage Form" at Doc. No. 1-1, PageID# 80. (Doc. No. 44 at PageID# 1439.) Defendant emphasizes that, not only did Plaintiff improperly withhold the Hughes Report from Auto-

Owners, but Ms. Makridis also falsely claimed to have no knowledge of the cause of the loss during her November 2022 Examination Under Oath. (*Id.* at PageID# 1440) (citing Doc. No. 34-1 at PageID# 1242.)  Defendant argues that it is not required to show prejudice because it is Plaintiff's obligation under the Policy to meet the condition precedent of cooperation.  (*Id.* at PageID# 1441.)  Even if it were required to show prejudice, Defendant argues that it was clearly prejudiced because the Hughes Report is "vital to the claim" and Plaintiff's failure to provide it "clearly interfere[d] with Auto-Owners' ability to contest the merits of the claim and its investigation of the same." (*Id.*)

Under Ohio law, "[w]hen a contract of insurance includes a cooperation clause, an insured's cooperation in defending an action brought against him is a material condition of the insurance policy and a condition precedent to the insurer's duty to provide liability coverage."  *Weller v. Farris*, 708 N.E.2d 271, 273-274 (Ohio App. 2nd. Dist. 1998).  *See also Gabor v. State Farm Mut. Auto. Ins. Co.*, 583 N.E.2d 1041, 1043 (Ohio App. 8th Dist. 1990); *Doerr v. Allstate Ins. Co.*, 121 Fed. Appx. 638, 640 (6th Cir. 2005) ("Under Ohio law, an insured party has a duty to comply with a cooperation clause.")  "When an insurance company demands information, the policyholder is 'required to make a fair and frank disclosure of information demanded by the company.'"  *Gabor*, 583 N.E.2d at 1043 (quoting *Luntz v. Stern*, 20 N.E.2d 241, syllabus para. 4 (Ohio 1939)).

However, "to constitute a defense to liability, an insured's lack of cooperation must result in material and substantial prejudice to the insurance company." *Gabor*, 583 N.E.2d at 1043 (citing *State Farm Mut. Auto. Ins. Co. v. Holcomb*, 458 N.E.2d 441, 445 (Ohio App. 9th Dist. 1983)).  *See also Doerr*, 121 Fed. Appx. at 640; *Ngoc Tran v. Federal Ins. Co.*, 728 Fed. Appx. 576, 577 (6th Cir. 2018) (applying Ohio law).  Courts have found material and substantial prejudice where a failure to cooperate has impeded an insurance company's ability to complete a "full and fair investigation" of

a claim. *See, e.g., Doerr*, 121 Fed. Appx. at 641-642; *Ngoc Tran*, 728 Fed. Appx. at 578. *See also Weller*, 708 N.E.2d at 275-276 (noting that "[p]rejudice has been described as involving material injury to the insurer's ability to contest the merits of the case ...., or serious impairment in investigating the claim or defending the merits of the case.")(internal quotations omitted). A party's compliance with some of a policy's requirements does not excuse the party's material failure to comply with others. *Doerr,* 121 Fed. Appx. at 640 (citing *Walker v. Buck*, 621 N.E.2d 1307, 1309 (Ohio App. 9th Dist. 1993))

"Whether an insured has violated the cooperation clause of his policy is a question to be determined in view of the facts and circumstances in each case." *Gabor,* 583 N.E.2d at 1043. "Generally, whether a party's noncooperation relieves the insurer of the obligation to pay is a question of fact." *Ngoc Tran*, 728 Fed. Appx. at 577. *See also Doerr*, 121 Fed. Appx. at 640; *Gabor*, 583 N.E.2d at 1043. A court may decide the cooperation clause issue as a matter of law, however, when a case presents undisputed facts. *See Doerr*, 121 Fed. Appx. at 640; *Ngoc Tran*, 728 Fed. Appx. at 577.

Here, the Court first notes that (notwithstanding Plaintiff's arguments to the contrary) the Policy does, in fact, contain a cooperation clause. Specifically, Section E(3)(a)(8) of the Policy provides as follows:

**E.     Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

\*\*\*

**3.     Duties in the Event of Loss or Damage.**

> a.    You must see that the following are done in the event of loss or damage to Covered Property:
>
> ***
>
> (8)    Cooperate with us in the investigation or settlement of the claim.

(Doc. No. 1-1 at PageID# 80.)  In addition, the record reflects (and Plaintiff does not dispute) that in both its December 9, 2021 and December 20, 2021 letters, Defendant specifically requested that Plaintiff provide "any additional information you believe to be relevant to the question of coverage." (Doc. No. 27-2 at PageID#s 696; Doc. No. 27-3 at PageID# 703.)  *See also* J. Steinbeck Aff. (Doc. No. 27-1) at ¶ 16 (averring that "Auto-Owners, through its coverage counsel, requested that Plaintiff provide all relevant documentation regarding the loss in Plaintiff's possession.")

As set forth *supra*, Defendant denied Plaintiff's claim on December 20, 2021 based on Mr. Caldwell's Report.  Plaintiff thereafter retained Mr. Hughes, who issued his Report on May 17, 2022. (Doc. No. 27-6.)  On May 24, 2022, Plaintiff identified Mr. Hughes as its expert in the state court building proceedings and attached a copy of his Report to Plaintiff's filing in the Trumbull County Administrative Appeal.  *See* Doc. No. 26-1 at Tr. 75-76; Doc. No. 12-3 at PageID#s 238-240.  Among other things, Mr. Hughes stated in his Report that: "My opinions along with the Insurance Company engineering opinions are in total agreement about the root cause and origins of the failure.  The cause is due to a brittle connection between the outer (brick) and inner (clay block) walls that did not have any built-in ductility for thermal expansion and contraction."  (Doc. No. 27-6 at PageID# 717.)

In or around August 2022, Defendant reopened Plaintiff's claim after receiving notice that Plaintiff had retained coverage counsel.  (Doc. No. 27-1 at ¶¶ 15, 16.)  It is undisputed that Plaintiff did not disclose the existence, or provide a copy, of the Hughes Report to Defendant.  Several months later, in November 2022, Defendant (through counsel) conducted an Examination Under Oath of Ms.

Makridis. (Doc. No. 27-at ¶ 16; Doc. No. 34-1.) Defense counsel asked Ms. Makridis if Plaintiff had a "position" regarding the cause of the loss. Ms. Makridis did not disclose Mr. Hughes's finding, instead testifying as follows:

> Q:    Do you have a position on behalf of 155 South Park LLC as to what the cause of this loss was?
>
> A:    I – this is way over my head. I have absolutely zero interest in structures or causes or- -- I -- should. I do not. I have no interest. I'm sorry. I don't dwell on that at all.
>
> Q:    All right. So you as the insured under the policy, you don't know what the cause of the loss was?
>
> A:    No. I leave all that to my brother, George. ***

(Doc. No. 34-1 at Tr. 42.) Defendant ultimately obtained a copy of the Hughes Report in March 2023 through a public records request to the City of the Warren Building Department. (Doc. No. 27-1 at ¶ 17.) Mr. Steinbeck avers that "Mrs. Makridis never provided Mr. Hughes' report previously to Auto-Owners, nor had Auto-Owners been made aware of Plaintiff's retention of Mr. Hughes as an engineer to investigate the cause of the loss." (*Id.* at ¶ 18.)

For the following reasons, the Court rejects Defendant's argument that coverage is void because Plaintiff violated the Policy's cooperation clause by failing to disclose the Hughes Report. Even assuming that Plaintiff was required to disclose the Hughes Report to Defendant once it waived work product protection by filing that Report in state court, the Court finds that Defendant has failed to demonstrate that it suffered "material and substantial prejudice" as a result of Plaintiff's failure to do so.

As an initial matter, the Court rejects Defendant's argument that "Auto-Owners is not required to show prejudice" because "it is Plaintiff's obligation under the Policy to meet the conditions

precedent, such as the duty to cooperate, in order to be entitled to insurance coverage." (Doc. No. 44 at PageID# 1441.) Defendant cites no authority in support of this assertion. And, indeed, Defendant's failure to cite any supporting authority is not surprising since Ohio courts (and federal courts interpreting Ohio law, including the Sixth Circuit) have repeatedly and consistently held that "to constitute a defense to liability, an insured's lack of cooperation must result in material and substantial prejudice to the insurance company." *Gabor*, 583 N.E.2d at 1043 (citing *Holcomb*, 458 N.E.2d at 445). *See also Doerr,* 121 Fed. Appx. at 640; *Ngoc Tran*, 728 Fed. Appx. at 577; *Peters v. Auto-Owners (Mutual) Ins. Co*., 2025 WL 1104928 at * 4 (S.D. Ohio April 14, 2025) (collecting cases); *Gaston v. Allstate Ins. Co*., 2008 WL 5716525 at *3 (N.D. Ohio July 31, 2008) (collecting cases). Thus, Defendant's assertion that it is not required to demonstrate prejudice is wholly unsupported and without merit.

The Court further finds, based on the undisputed facts, that Defendant has not demonstrated that it was materially and substantially prejudiced by Plaintiff's failure to disclose the Hughes Report. As noted above, courts have found material and substantial prejudice where a failure to cooperate has materially injured an insurer's ability to contest the merits of the case, or impeded an insurer's ability to complete a "full and fair investigation" of a claim. *See, e.g., Doerr*, 121 Fed. Appx. at 641-642; *Ngoc Tran*, 728 Fed. Appx. at 578; *Weller*, 708 N.E.2d at 275-276. Defendant has made no such showing here. While Defendant argues generally that the Hughes Report (which, as noted above, demonstrates that Mr. Hughes agreed with Mr. Caldwell regarding the cause of the loss) is relevant and material to Plaintiff's claim, Defendant has not demonstrated Plaintiff's failure to disclose it materially injured Defendant's ability to investigate the claim or contest the merits of the instant case. To the contrary, it is undisputed that Defendant obtained the Hughes Report in March 2023, well

before the close of fact and expert discovery herein.  Defendant provided the Hughes Report to Mr. Caldwell, who then authored a Supplemental Report on March 10, 2023 that expressly addressed and refuted Mr. Hughes' findings.  (Doc. No. 27-7 at ¶¶ 18, 21; Doc. No. 27-10.)  Additionally, it is undisputed that, at all relevant times, both Mr. Steinbeck and Mr. Caldwell had unimpeded access to the Property for purposes of inspecting and investigating the loss.  (Doc. No. 27-7 at ¶ 5; Doc. No. 27-1 at ¶ 4.)

In light of the above, and based on the undisputed facts presently before it, the Court rejects Defendant's argument that it was materially prejudiced by Plaintiff's failure to disclose the Hughes Report.

The Court also rejects Defendant's argument that coverage is voided because Plaintiff violated the Policy's provision regarding fraud/intentional concealment.  As noted *supra,* Section A of the "Commercial Property Conditions" provides that: "This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: 1. This Coverage Part; 2. The Covered Property; 3. Your interest in the Covered Property; or 4. A claim under this Coverage Part."  (Doc. No. 1-1 at PageID# 113.)

In its Motion, Defendant argues (summarily) that Plaintiff's "non-production of the Hughes Report indicates an act of concealment of relevant information to Auto-Owners' investigation, warranting voiding coverage."  (Doc. No. 27 at PageID# 676-677.)  Notably, Defendant cites no authority regarding the standard applied by Ohio courts in determining whether coverage should be voided based on an insured's fraud and/or intentional concealment.  Nor does Defendant cite any authority in which a court has voided coverage on this basis under circumstances similar to the instant

case.[19]  (*Id*.)  In sum, Defendant summarily argues that coverage is voided due to Plaintiff's intentional concealment of the Hughes Report but makes no effort, of any kind, to cite, discuss, or apply any law in support thereof.  This is wholly insufficient.

It is well established that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).  *See also Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (same).  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones."  *McPherson*, 125 F.3d at 995.  Here, the Court finds that, by failing to provide any citation to authority or meaningful discussion of this issue, Defendant has waived its argument that coverage is void because Plaintiff intentionally concealed the Hughes Report.  The Court will not *sua sponte* research this issue and attempt to apply any relevant authority to the circumstances presented herein.  In light of Defendant's failure to sufficiently raise this argument, the Court declines to consider it herein.

Accordingly, and for all the reasons set forth above, the Court rejects Defendant's argument that it is entitled to summary judgment in its favor with respect to Count I based on Plaintiff's failure to cooperate and/or fraud/intentional concealment.

### b. Coverage

In their respective summary judgment motions, Plaintiff and Defendant argue that they are each entitled to judgment in their favor with respect to the issue of coverage for the December 4, 2021 loss.  It is undisputed that Ohio law applies to the instant dispute.  Under Ohio law, "[a]n insurance

---

[19] Defendant fares no better in its Reply Brief, citing only one unreported case from 1988 for the definition of the term "concealment."  (Doc. No. 44 at PageID# 1440.)

policy is a contract whose interpretation is a matter of law." *Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006) (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)). A court "examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

"Simply because a term in a contract is not defined does not mean that the policy is ambiguous." *Penton Media, Inc. v. Affiliated Fm Ins. Co.*, 2005 WL 8171363 at *6 (N.D. Ohio Sept. 30, 2005) (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)). Rather, a court must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. . . . As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.*

On the other hand, if a contract is ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent." *Id.* A court may not "alter a lawful contract by imputing an intent contrary to that expressed by the parties." *Id.* at 1261-62. In the insurance context, "[i]f provisions are susceptible of more than one interpretation, they 'will be construed strictly against the insurer and liberally in favor of the insured.'" *Sharonville*, 846 N.E.2d at 836 (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, syllabus (Ohio 1988)). "Additionally, 'an exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded.'" *Id.* (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* 597 N.E.2d 1096, 1102 (Ohio 1992)).

58

This rule has limitations.  While an insurance policy that is "reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy."  *Westfield Ins. Co.*, 797 N.E.2d at 1261 (quoting *Morfoot v. Stake*, 190 N.E.2d 573, syllabus (Ohio 1963)).

In its Motion, Plaintiff begins by arguing that it is entitled to coverage because the December 4, 2021 loss constitutes a "direct physical loss" under Section A of the Policy. (Doc. No. 32 at PageID#s 1016-1017.)  As noted *supra*, Section A of the Policy's "Building and Personal Property Coverage Form" provides that "[w]e [i.e. Defendant] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  (Doc. No. 1-1 at PageID# 72.)  In defining the term "Covered Cause of Loss," the Policy refers to the "applicable Cause of Loss Form as shown in the Declarations."  (*Id.* at PageID# 73.)  In relevant part, Section A of the "Causes of Loss - Special Form" provides that "Covered Causes of Loss" means "Risks of Direct Physical Loss unless the loss is 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations, that follow."  (*Id.* at PageID# 95.)

Relying on this language, Plaintiff maintains that the December 4, 2021 loss is covered under the Policy because it is a "Direct Physical Loss" and none of the Section B Exclusions apply.  (Doc. No. 32 at PageID#s 1017-1019.) Specifically, Plaintiff asserts that there is no genuine issue of material fact that the Wear and Tear, Collapse, and Section (B)(3) Exclusions do not apply because the December 4, 2021 loss is a "specified cause of loss" under Paragraph G of the Policy, i.e., the loss was caused by windstorm and/or water damage.  (*Id.*)  Plaintiff further argues that the ACC provision provides an independent basis for coverage in the instant case because (1) "there was no

59

indication of hidden decay;" and (2) "the collapse of this wall rendered the entire of the interior suites along the south wall of the building unoccupiable by tenants."  (*Id.*)

Defendant maintains that, contrary to Plaintiff's argument, the Policy is not an "all-risk" policy providing coverage unless an express exclusion bars coverage.  (Doc. No. 36 at PageID# 1343.)  Rather, Defendant asserts, "the Policy is a 'named-peril' Policy as the 'Causes of Loss-Special Form' is designated within the Policy declarations and covers only specific, listed perils within."  (*Id.*)  Defendant thus maintains that "Plaintiff must specifically prove how exceptions to the noted Exclusions apply to denote if there is coverage."  (*Id.* at PageID# 1344.)

Defendant then proceeds to argue that the December 4, 2021 loss is excluded under the Wear and Tear, Collapse, and Section (B)(3) Exclusions.  (*Id.* at PageID#s 1344- 1346.)  Defendant asserts that Plaintiff has misinterpreted the "specified causes of loss" provision in the Policy, arguing that that provision does not state that Wear and Tear Exclusion does not apply if a cause of loss identified therein (such as rust, wear and tear, corrosion, etc.) is caused by a "specified cause of loss."  (*Id.*)  Rather, Defendant argues that "the Wear and Tear Exclusion specifically states that if the excluded cause of loss listed within (e.g., rust, wear and tear, settling, cracking, expansion, etc.) **<u>results in</u>** a specified cause of loss (e.g., fire, lightning, windstorm, water damage, etc.) then Auto-Owners will pay for damages caused by the 'specified cause of loss.'"  (*Id.*)  Defendant argues that the instant case "is not a cause where a cause of loss as listed in the Wear and Tear Exclusion resulted in a 'specified cause of loss.'"  (*Id.* at PageID#s 1344-1345.)  Defendant likewise argues that "evidence of 'wind' and 'water' contributing to the loss does not prove an exception [to] the Collapse Exclusion."  (*Id.* at PageID# 1346.)  Defendant further maintains that the Section (B)(3) Exclusion applies because "Mr.

60

Caldwell clearly found an ample amount of evidence in this case for defective workmanship leading to the collapse." (*Id*. at PageID# 1351.)

Lastly, Defendant argues that coverage is not provided under the ACC because "the overwhelming evidence in this case shows that there was nothing 'hidden' about the damage of the Subject Property before the loss, and the damages were apparent long before the loss." (*Id*. at PageID# 1349.)  Additionally, Defendant maintains that the ACC does not apply because Ms. Makridis testified that her law firm occupied the Property for over seven (7) months after the loss. (*Id*. at PageID# 1350.)

### i.    The Collapse Exclusion and Additional Coverage-Collapse Provision

The Court begins with a discussion of the Collapse Exclusion and the Additional Coverage-Collapse Provision.  At the outset, the Court notes that it is undisputed that the December 4, 2021 loss constitutes a "collapse" for purposes of the Collapse Exclusion.  (Doc. No. 32 at PageID# 1018; Doc. No. 36 at PageID# 1348.)  The Collapse Exclusion (set forth in Section B(2)(k) of the Causes of Loss-Special Form) provides that Defendant "will not pay for loss of damage caused directly or indirectly by":

> k.    Collapse, including any of the following conditions of property or any part of the property:
>
> > (1)    An abrupt falling down or caving in;
> >
> > (2)    Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
> >
> > (3)    Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

61

(Doc. No. 1-1 at PageID# 97.)  Thus, since the parties do not dispute that the December 4, 2021 loss is a "collapse," Plaintiff is not entitled to coverage unless an exception to the Collapse Exclusion applies.  Notably, the Collapse Exclusion contains several relevant exceptions, as follows:

> **This exclusion, k., does not apply:**
>
> **(a)**    **To the extent that coverage is provided under the Additional Coverage – Collapse**; or
>
> **(b)**    **To collapse caused by one or more of the following:**
>
> > **1)**    **The "specified causes of loss";**
> > 2)    Breakage of building glass;
> > 3)    Weight of rain that collects on a roof; or
> > 4)    Weight of people or personal property.

(*Id*. at PageID#s 97-98) (emphasis added).  Plaintiff argues that it is entitled to judgment in its favor on the issue of coverage because (1) the December 4, 2021 collapse is not excluded under the Collapse Exclusion because it was caused by "specified causes of loss," i.e., windstorm or water damage; and/or (2) there is an independent basis for coverage under the ACC provision.  Defendant disputes both contentions.  The Court will address these issues separately, below.

### a.    "Specified Causes of Loss"

Relying heavily on Mr. Patton's Expert Report, Plaintiff argues, at length, that the December 4, 2021 collapse is excepted from the Collapse Exclusion (and, therefore, covered under the Policy) because it was caused by "specified causes of loss," i.e. windstorm and water damage.  (Doc. No. 32 at PageID# 1018.)  As noted *supra*, the term "specified causes of loss" (which is used in both the Wear and Tear Exclusion and the Collapse Exclusion) is defined in Section G(2) of the Policy (in relevant part) as follows:

> 2.    "Specified causes of loss" means the following: fire; lightning; explosion; **windstorm** or hail; smoke; aircraft or vehicles; riot or civil commotion;

> vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; **water damage**.

(*Id.* at PageID#s 102) (emphasis added).  The term "water damage" is defined as "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam."  (*Id.* at PageID# 103.)

For the following reasons, the Court rejects Plaintiff's argument that the December 4, 2021 collapse was caused by a "specified cause of loss."  First, the Court finds that there is no evidence that the December 4, 2021 collapse was caused by "water damage," as that term is defined in Section G(2)(c) of the Policy.  Specifically, Plaintiff has not directed this Court's attention to any evidence that the December 4, 2021 collapse was caused by an "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam."  (Doc. No. 1-1 at PageID# 103.)

Second, the Court finds that Plaintiff has not come forward with sufficient evidence to demonstrate that the December 4, 2021 collapse was caused by a "windstorm."  As noted above, Mr. Patton opined that "a rare weather phenomenon occurred at the near exact time the wall collapsed with plummeting humidity and high winds."  (Doc. No. 33-7 at PageID# 1112.)  Specifically, Mr. Patton noted that: "At the time of the collapse of the wall, the relative humidity took a drastic downturn by at least 30 percent within minutes of the time of the collapse" and "[t]he wind picked up to over 20 mph according to the weather graphic." (*Id.* at PageID# 1111.)  He found that "once the winds picked up with the drastic humidity drop, the front face of the brick and mortar began to

dry out rapidly while the internal face remained the same as it had been for days." (*Id.* at PageID# 1112.) Mr. Patton stated that "[t]his rapid drying created a contraction at the brick face separating the brick and mortar." (*Id.*) Thus, he concluded that "the wall collapsed from a rapid differential moisture change that caused an outward prying action sending bricks outward from the building." (*Id.*) Aside from Mr. Patton's Report, Plaintiff points to no other evidence that the December 4, 2021 collapse was caused by a "windstorm."

In his Supplemental Report, Mr. Caldwell disagreed with Mr. Patton that the loss was caused by weather conditions on December 4, 2021. (Doc. No. 33-11 at PageID#s 1179-1181.) Of particular note, Mr. Caldwell emphasized that, on that date, the maximum wind speed that was reported at the Youngstown Warren Regional Airport was 25 mph. (*Id.*) Using the so-called "Beaufort number"[20] for describing the effects of wind on land, Mr. Caldwell opined that "[b]y no means are 25 mph maximum wind speeds considered 'high winds,' and exposure to 25 mph maximum wind speeds would not result in structural damage to brick veneer." (*Id.*)

The Court finds that Mr. Patton's Report does not establish, or create a genuine issue of material fact, that the December 4, 2021 collapse was caused by a "windstorm." The term "windstorm" is not defined in the Policy. The Court, then, must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "'In determining the plain and

---

[20] The "Beaufort number" used by Mr. Caldwell is derived from the so-called Beaufort Wind Scale. According to the National Weather Service's website: "One of the first scales to estimate wind speeds and the effects was created by Britain's Admiral Sir Francis Beaufort (1774-1857). He developed the scale in 1805 to help sailors estimate the winds via visual observations. The scale starts with 0 and goes to a force of 12. The Beaufort scale is still used today to estimate wind strengths." *See* www.weather.gov/mfl/beaufort. Under the Beaufort scale, wind at a speed of 25 mph is given a Beaufort number of 6, which applies to wind speeds of 25 mph to 31 mph. *Id.* Wind with a Beaufort number of 6 is classified as a "strong breeze." *Id.* The effects of a "strong breeze" on land are described as follows: "Large branches in motion; whistling heard in telegraph wires; umbrellas used with difficulty." *Id.*

ordinary meaning of a word, courts may look to dictionary definitions of the word.'" *Sliva v. Muhammad*, 253 N.E.3d 238, 244 (Ohio App. 10th Dist. 2024) (quoting *State v. Bertram*, 229 N.E.3d 8, 12 (Ohio 2023)). *See also U.S. Specialty Ins. Co. v. Drake Aerial Enterprises, LLC*, 328 F.Supp.3d 781, 784 (N.D. Ohio 2018) ("The Sixth Circuit and other federal courts, as well as the Ohio courts, look to dictionary definitions to determine the plain and ordinary meaning of undefined terms in insurance contracts.")

The Merriam Webster Dictionary defines the term "windstorm" as "a storm marked by high wind with little or no precipitation." *See* www.merriam-webster.com/dictionary/windstorm. The Encyclopedia Brittanica provides a more specific definition, defining the term "windstorm" as follows: "[W]ind that is strong enough to cause at least light damage to trees and buildings and may or may not be accompanied by precipitation. Wind speeds during a windstorm typically exceed 55 km (34 miles) per hour. Wind damage can be attributed to gusts (short bursts of high-speed winds) or longer periods of stronger sustained winds. Although tornadoes and tropical cyclones also produce wind damage, they are usually classified separately." *See* www.brittanica.com/science/windstorm.

Based on the above, the Court finds that the 25 mph winds that occurred at the time of the December 4, 2021 collapse do not qualify as a "windstorm" for purposes of the Policy. As noted above, a windstorm is marked by "high winds" with wind speeds typically exceeding 34 miles per hour. Moreover, under the Beaufort Scale, winds of 25 mph to 31 mph are considered a "strong breeze" – not a "high wind." The Court is simply not convinced that wind speeds of up to 25 mph constitute a "windstorm," using the plain and ordinary meaning of that term. Moreover, even assuming *arguendo* that 25 mph winds do constitute a "windstorm," a careful review of Mr. Patton's Report demonstrates that he did not find that the collapse was caused by wind. Rather, Mr. Patton

found that the collapse was caused by a combination of factors -- "plummeting humidity" levels with wind of over 20 mph, which together led to a "rapid differential moisture change that caused an outward prying action sending bricks outward from the building." (Doc. No. 33-7 at PageID#s 1111-1112.)  The "specified causes of losses" identified in the Policy do not include this combination of forces, i.e., humidity, wind, and moisture change.

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to come forward with sufficient evidence to demonstrate that the December 4, 2021 collapse was caused by a "specified cause of loss."  Thus, Plaintiff has failed to demonstrate that the December 4, 2021 collapse is excepted from the Collapse Exclusion because it was caused by a "specified cause of loss."

### b.  Additional Coverage-Collapse  ("ACC")

Plaintiff next argues that the Collapse Exclusion does not apply because coverage is provided under the ACC provision.  The ACC provision (set forth in Section D of the Causes of Loss- Special Form) reads (in relevant part) as follows:

> The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in D.1. through D.7.
>
> 1. For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building **cannot be occupied for its intended purpose**.
>
> 2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:
>
>   a. **Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse**;
>
>   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

66

\*\*\*

    d.      **Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction**, remodeling or renovation **is complete**, but only if the collapse is **caused in part by:**

    **(1)**      **A cause of loss listed in 2.a, or 2.b.;**
    (2)      One or more of the "specified causes of loss";

\*\*\*

(Doc. No. 1-1 at PageID# 100) (emphasis added).

The Court first finds that the December 4, 2021 loss constitutes an "abrupt collapse" within the meaning of Section (D)(1) of the ACC.  As set forth above, this provision provides that an "abrupt collapse" means "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building **cannot be occupied for its intended purpose**."  (*Id.* at PageID# 100) (emphasis added).   The phrase "cannot be occupied" for its intended purpose is not defined in the Policy.

The parties have differing interpretations of the meaning of the phrase "cannot be occupied." Defendant argues that the December 4, 2021 loss does not constitute an "abrupt collapse" because it is undisputed that Plaintiff did, in fact, occupy the Property for its intended purpose well after the loss.  (Doc. No. 36 at PageID# 1350.)  In support of this argument, Defendant correctly notes that Ms. Makridis testified that she continued to operate her law firm out of the Property until July 8, 2022, i.e., seven months after the December 4, 2021 loss.  (*Id.*) (citing Doc. No. 26-1 at PageID# 335.)  Thus, Defendant interprets the phrase "cannot be occupied" in a literal sense, i.e., that the term "abrupt collapse" means an abrupt falling down or caving with the result that the insured "cannot occupy the premises" in a physical, literal sense.

Plaintiff, on the other hand, argues that the December 4, 2021 loss does constitute an "abrupt collapse" under the "plain meaning" of the ACC because (although Plaintiff did continue to occupy the premises after the loss) the City of Warren issued an Unsafe Building Order on December 4, 2021, in which it declared the Property unsafe and ordered that it be vacated for the safety of its occupants. (Doc. No. 33-6.)  Thus, Plaintiff interprets the phrase "cannot be occupied" to mean that the insured cannot occupy the premises (or part of the premises) because it is not safe and/or legal for the insured to do so.

The Court finds that the phrase "cannot be occupied" is ambiguous because it is reasonably susceptible to more than one interpretation.  It is well established that "where the provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *Thiemens v. Grange Mut. Cas. Co.*, 2013 WL 1777137 at * 4 (Ohio App. 5th Dist. April 11, 2013) (citing *King,* 519 N.E.2d at paragraph one of the syllabus).

Upon careful review, and construing the phrase "cannot be occupied" liberally in favor of Plaintiff, the Court finds that the December 4, 2021 loss constitutes an "abrupt collapse" for purposes of Section D(1) of the ACC provision.  It is undisputed that the City of Warren Building Department issued an "Unsafe Building Order" in which it expressly found that the Property was unsafe because "the building's exterior wall coverings have or are deteriorated to a point where they are failing and falling to the ground which may cause injury or death to persons or personal property."  (Doc. No. 33-6 at Tr. 26.)  The City therefore ordered the entire building to be vacated "for [the] safety of the occupants" and directed that it could not be re-occupied until certain restoration/repair work was performed.  (*Id.* at PageID# 1104-1106.)  Moreover, the state court later ordered Plaintiff to vacate

the building and expressly found that the City's Unsafe Building Order was "supported in the record by a preponderance of substantial, reliable, and probative evidence." *See* Trumbull County Administrative Appeal, Orders dated July 6, 2022 and July 12, 2023. Under these circumstances and construing the phrase "cannot be occupied" in favor of the insured, the Court agrees with Plaintiff that the December 4, 2021 loss constitutes an "abrupt collapse" because the result of the collapse was that the building or part of the building could not be safely (or legally) occupied.

The Court rejects Defendant's argument to the contrary. The fact that Ms. Makridis knowingly violated the Unsafe Building Order for seven months does not translate into a finding that the Property could be occupied within the meaning of Section D(1) of the ACC. Although Ms. Makridis was apparently physically able to enter and occupy part of the Property after the December 4, 2021 collapse, her continued occupation of the premises was neither safe nor legally sanctioned under the City's Unsafe Building Order. Under these circumstances, the fact that Ms. Makridis continued to occupy the Property in violation of the City's Order does not mean that the December 4, 2021 loss does not constitute an "abrupt collapse" under Section D(1) of the ACC.

Having determined that the December 4, 2021 loss is an "abrupt collapse" under Section D(1), the Court considers whether there is a genuine issue of material fact regarding whether that loss is covered under Sections D(2)(a) or D(2)(d)(1). As set forth above, Section D(2)(a) provides that: "We will pay for direct physical loss or damage to the Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form .... if such collapse is caused by one or more of the following: (a) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." (Doc. No. 1-1 at PageID# 100.) Relatedly, Section D(2)(d)(1) provides Defendant will pay for direct physical loss or damage to

Covered Property caused by an abrupt collapse if such collapse is caused by "use of defective material or methods of construction" occurring prior to the abrupt collapse "but only if the collapse is caused in part" by "building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." (*Id.*)  Both of these provisions then, turn on whether the collapse was caused by "building decay that is hidden from view" that was not known to the insured prior to the collapse.

Here, there is competing evidence regarding whether the December 4, 2021 abrupt collapse was caused by "building decay that is hidden from view."  Defendant's expert, Mr. Caldwell, opined that there were several indicators that decay had been observable for some time and should have raised a "red flag" about the Property.  For example, Mr. Caldwell stated that he witnessed "displaced and bulged brick along the beam flanges" and that this indicated that "the brick had been subjected to outward movement for some time."  (Doc. No. 27-7 at ¶ 11; Doc. No. 27-9 at PageID# 747.)  Mr. Caldwell also observed that, at the non-collapsed sections of the brick, the "brick along the top flange of the floor beam was displaced, and a ledge had formed between adjacent courses of brick."  (Doc. No. 27-9 at PageID# 747.)  He found that this displacement was evident in the June 2011 and August 2019 Google Earth photos of the Property.  (*Id.*)

Mr. Caldwell also observed severe staining and discolored brick, which (in his view) indicated that "the brick had been displaced outward and exposed to environmental staining for a long time."  (Doc. No. 27-7 at ¶ 12.)  In addition, Mr. Caldwell noted a horizontal caulk line above the area of collapsed brick "along the top flange of the roof beam."  (Doc. No. 31-1 at Tr. 39.)  He testified that this caulking indicated that the "horizontal mortar joint was open and cracked," which he believed occurred "because of the cracking and the displacement of the brick at some point in time."  (*Id.* at

70

Tr. 39, 41.)  Lastly, Mr. Caldwell testified that he observed severely rusted steel window lintels along the west and north (but not the south) elevations of the Property.  (Doc. No. 27-9 at PageID#s 747-748; Doc. No. 31-1 at Tr. 100.)

Mr. Caldwell acknowledged that "a layperson who knows nothing about construction" might not have realized the significance of the obvious displaced and discolored brick, caulk line, and rusting.  (Doc. No. 31-1 at Tr. 93.)  He testified that, however, when the caulking was done along the horizontal mortar joint, this "should have been a red flag" to the company that performed the work because the caulking indicated that the "brick is getting moved and is displacing outward."  (*Id*. at Tr. 94, 95.)  Mr. Caldwell further opined that this evidence of outward decay stemmed from defective workmanship, i.e., the lack of proper/adequate anchorage between the brick veneer and the building structure and the lack of proper expansion joints in the brick veneer.  (Doc. No. 27-7 at ¶ 8.)

Plaintiff argues that, even assuming *arguendo* that there was a lack of proper/adequate anchorage between the brick veneer and the building structure that resulted in the collapse (as opined by Mr. Caldwell, and Mr. Hughes for that matter), any such condition by its very nature existed *behind the brick veneer* and was, therefore, clearly hidden from view.  (Doc. No. 40 at PageID# 1395.)  In addition, Plaintiff disputes Defendant's contention that there were observable indicators of decay.  While Mr. Patton noted the presence of some displaced and/or discolored bricks in photographs of the south wall of the Property, he also testified that he only observed "a couple of" such bricks and even those were about six feet away from the area of collapse.  (Doc. No. 30-1 at Tr. 140.)  Notably, Mr. Patton further explained that the presence of displaced brick was not necessarily a sign of a problem with the Property's structural integrity.  (*Id.* at Tr. 62-63.)  Rather, Mr. Patton

testified that "[m]oving bricks can be a sign of a whole host of different things," including a "non-structural issue." (*Id*.)

Lastly, Mr. Patton testified that "the majority of Americans" would not make a connection between a few displaced/discolored bricks and a caulk line, and a structural integrity problem. (*Id*. at Tr. 141.) And, indeed, Ms. Makridis expressly avers that "at no point during my tenancy did I have any reason to suspect any defect or danger." (Doc. No. 40-1 at ¶ 15.) Ms. Makridis further avers that "[m]y staff, clients, and I parked alongside this wall on a daily basis, and no one ever noticed any problems or issues." (*Id*. at ¶ 16.)

Based on the above competing evidence and testimony, the Court finds that there is a genuine issue of material fact regarding whether the December 4, 2021 collapse is covered under Sections D(2)(a) and/or D(2)(d)(1) of the ACC.

Lastly, because the Court finds that there is a genuine issue of material fact regarding coverage under Sections D(2)(a) and/or D(2)(d)(1) of the ACC, the Court need not reach the parties' arguments regarding the Wear and Tear and Section B(3) Exclusions. It is well established that "[a]n insurance policy is to be read from beginning to end with the more specific provisions governing the general ones." *Foster v. D.B.S. Collection Agency,* 2008 WL 755082 at * 12 (S.D. Ohio March 20, 2008). *See also Monsler v. Cincinnati Cas. Co*., 598 N.E.2d 1203, 1209 (Ohio 10th Dist. 1991) ("A fundamental principle of contract construction requires that the document be read as a whole in order to identify the intent of the parties. A specific provision controls over a general one.") Here, the Policy contains specific provisions that govern in the event of a collapse, i.e., the Collapse Exclusion and the ACC provision. Under the circumstances presented, and reading the Policy as a whole, the

Court finds that the Collapse Exclusion and ACC control over the more general Wear and Tear and Section B(3) Exclusions.[21]

Accordingly, and for all the reasons set forth above, the Court finds that neither Plaintiff nor Defendant are entitled to summary judgment in their favor with respect to Plaintiff's Breach of Contract claim (Count I).

## 2.     Declaratory Judgment (Count II)

In Count II, Plaintiff alleges that "[t]he collapse of the Property's southern wall was caused by, if not other things that would trigger coverage under the Policy, concealed decay, movement, shifting, or other causes." (Doc. No. 1-1 at ¶ 18.)  Plaintiff further alleges that "[t]he building has not been occupied for its intended purpose per the Unsafe Building Order of the City of Warren." (*Id.* at ¶ 19.)  Thus, Plaintiff seeks "a declaration that coverage under the insurance policy does apply, and that Auto-Owners is obligated to provide coverage for the damages and claims stemming from the southern wall's collapse." (*Id.* at ¶ 20.)

Because the Court has found that there is a genuine issue of material fact regarding the issue of coverage for the December 4, 2021 loss, the Court likewise finds that neither Plaintiff nor

---

[21] Even assuming *arguendo* that the Wear and Tear and Section B(3) Exclusions were applicable here, the Court would find that there is a genuine issue of material fact regarding whether either of these Exclusions bars coverage for the December 4, 2021 loss.  Defendant argues that Mr. Caldwell's (and Mr. Hughes') Reports show that the December 4, 2021 collapse was caused by wear and tear, rust, decay, deterioration, hidden defect, settling, cracking, shrinking, expansion, and/or defective workmanship and, therefore, excluded under both the Wear and Tear and Section B(3) Exclusions.  Plaintiff disputes Mr. Caldwell's (and Mr. Hughes') conclusions, arguing that Mr. Patton's Report and testimony demonstrate that the Property was properly constructed in accordance with the building standards of the time and that there was no evidence of either defective workmanship or any condition that would fall within the Wear and Tear Exclusion.  Rather, Plaintiff argues that Mr. Patton's Report and testimony shows that the December 4, 2021 collapse was caused by a rare weather phenomenon, i.e., "plummeting humidity" levels with wind of over 20 mph, which together led to a "rapid differential moisture change that caused an outward prying action sending bricks outward from the building." (Doc. No. 33-7 at PageID#s 1111-1112.)  Even if the Wear and Tear and/or Section B(3) Exclusions applied, the Court finds that the competing expert testimony in this case would create a genuine issue of material fact as to the applicability of these Exclusions.

Defendant are entitled to summary judgment in their favor with respect to Plaintiff's Declaratory Judgment claim (Count II).

### 3. Bad Faith (Count III)

Lastly, in Count III, Plaintiff alleges that Auto-Owners did not properly investigate Plaintiff's claim for the December 4, 2021 loss and has at all times "acted in bad faith by not taking into consideration policy coverage as it applies to the facts." (Doc. No. 1-1 at ¶¶ 23, 24.) Plaintiff further alleges that "[d]espite objections from Plaintiff and the provision of engineering reports from the Plaintiff, the Defendant continues to wrongfully refuse coverage for this claim." (*Id*. at ¶ 25.) Plaintiff alleges that "by exercising bad faith by the Defendant, Plaintiff is entitled to damages under this cause of action equal to any compensatory damages stated herein for the repair and replacement of its building, lost revenue from the inability to use the building, all other compensatory as will be proven through discovery, as well as additional punitive damages for the breach of loyalty." (*Id*. at ¶ 28.)

Plaintiff argues that it is entitled to summary judgment in its favor with respect to its bad faith claim. (Doc. No. 32 at PageID#s 1029-1030.) Plaintiff argues that Mr. Steinbeck's Reservation of Rights and denial letters do not "clearly identify so much as one specific cause of the collapse, only the suspicion of several causes, none of which are clearly identified." (*Id*.) Plaintiff further asserts that Defendant "made a very generic and perfunctory statement as to what they believe are the exclusions without any scientific application of these exclusions to the physical loss itself." (*Id.*) Plaintiff emphasizes that Defendant's adjusters (Mr. Steinbeck and Jessica Gonzalez) had no experience in construction, physics, or chemistry, and both expressed uncertainty as to what defense

to assert.[22] (*Id.*) *See also* Doc. No. 40 at PageID# 1400. Plaintiff argues that Defendant "acted in a callous and disinterested manner" and "denied coverage for this event beginning from a position of looking for ways to deny, not accept liability." (Doc. No. 32 at PageID# 1030.) In sum, Plaintiff maintains that "there was simply no 'reasonable justification' for the denial." (*Id.*)

Defendant argues that, even if this Court finds that there is a genuine issue of material fact as to the breach of contract and declaratory judgment claims, it is nonetheless entitled to summary judgment in its favor with respect to Plaintiff's bad faith claim. (Doc. No. 27 at PageID#s 678-682.) Defendant argues that "this is a case where at the very least, Auto Owners was reasonably justified for its actions in handling Plaintiff's claim." (*Id.*) Defendant notes that, when the initial assessment presented questions regarding causation, Mr. Steinbeck properly retained Mr. Caldwell to assist in the investigation. (*Id.*) Defendant argues that it was only after Mr. Caldwell issued his report that Defendant determined that the ACC did not apply "based on Mr. Caldwell's findings that [] the Property's deterioration/decay was not hidden and existed well before the date of the loss." (*Id.*) Defendant further notes that, after Plaintiff provided a copy of Mr. Smithberger's Report which disagreed with Mr. Caldwell's findings, Defendant continued to investigate the claim and asked Mr. Caldwell to evaluate Mr. Smithberger's findings. (*Id.*) Defendant notes that Mr. Caldwell thereafter issued a Supplemental Report in which he stood by his previous findings. (*Id.*) Based on the above,

---

[22] Plaintiff notes that Mr. Steinbeck consulted senior claims examiner Ms. Gonzalez in September 2022 for advice about Plaintiff's claim, in particular about the distinction between decay and decomposition under the Policy. (Gonzlez Depo. (Doc. No. 28-1) at Tr. 10, 17.) Ms. Gonzalez testified in deposition that neither term is defined in the Policy and that she had to Google them in response to Mr. Steinbeck's inquiry. (*Id.* at Tr. 17-18) Ms. Gonzalez then testified that she believed that the caulk line indicated that Plaintiff was "aware of issues going on with the veneer, and that they were not hidden, nor decay." (*Id.* at Tr. 25-26.) *See also* Doc. No. 33-12 at PageID# 1197. However, Ms. Gonzalez acknowledged that, if there was deterioration behind the brick veneer, it would not be visible to the naked eye. (Doc. No. 28-1 at Tr. 27.) Plaintiff also notes that Mr. Steinbeck testified that, when he visited the Property on December 7, 2021, he did not see any evidence of wear and tear. (Steinbeck Depo. (Doc. No. 29-1) at Tr. 45.)

Defendant argues that there is no genuine issue of material fact that it was reasonably justified in relying on Mr. Caldwell's opinions and that its "coverage opinion was at least fairly debatable."  (*Id.*)

  "Based upon the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured."  *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, syllabus paragraph one (Ohio 1983).  *See also Scott Fetzer Co. v. American Home Assurance Co. Inc.*,  229 N.E.3d 70, 76 (Ohio 2023).  "[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor."[23] *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399–400 (Ohio 1994).

  Under Ohio law, an insurer lacks reasonable justification for its denial when its refusal to pay is predicated on an arbitrary and capricious belief that the insured is not entitled to coverage.  *See Hoskins*, 452 N.E. 2d at 1320 (Ohio 1983).  Arbitrary and capricious decisions are those "made without consideration of or regard for facts, circumstances, fixed rules, or procedures."  *Marshall v. Colonial Ins. Co.*, 2016 WL 7290968 at * 8 (Ohio App. 7th Dist. Dec. 9, 2016).  *See also Korwin v. State Farm Fire & Casualty Company*, 2024 WL 3638655 at * 5 (N.D. Ohio Aug. 2, 2024) (same).  An insurer may be reasonably justified in denying a claim when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim."  *Big Lots Stores, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 240 F.Supp.3d 725, 739

---

[23] Intent is not an element of a bad faith tort.  *Yates v. Allstate Ins. Co.*, 2012 WL 1902464 at *3 (S.D. Ohio May 25, 2012) (quoting *Zoppo v. Homestead Ins. Co.,* 644 N.E.2d 397 (Ohio 1994).  *See also Superior Credit Union, Inc. v. CUMIS Ins. Soc'y, Inc.*, 2019 WL 5557343 at *5 (S.D. Ohio Oct. 28, 2019), *adopted by* 2019 WL 6131267 (S.D. Ohio Nov. 19, 2019).  Rather, the applicable "standard for determining bad faith is simply 'reasonable justification'[.]" *Yates*, 2012 WL 1902464 at *3 (quoting *Zoppo*, 644 N.E.2d 397).

(S.D. Ohio 2017) (quoting *Tokles & Son, Inc. v. Midwestern Indemn. Co*., 605 N.E.2d 936, 943 (Ohio 1992)).  *See also Superior Credit Union, Inc.*, 2019 WL 5557343 at *5.

 "[P]erforming a cursory investigation and ignoring information that would tend to support the insured's claim can constitute bad faith." *Great West Cas. Co. v. Flandrich*, 605 F.Supp.2d 955, 980 (S.D. Ohio 2009) (citing *Zoppo*, 644 N.E.2d at 400).  *See also Diers v. State Farm Automobile Ins. Co.*, 2025 WL 240971 at * 2 (S.D. Ohio Jan. 17, 2025) (finding that "[a] genuine dispute exists over the adequacy of State Farm's investigation of Plaintiff's insurance claims, thus foreclosing summary judgment in State Farm's favor on the bad faith claim.")  The insurer "cannot merely conduct a cursory investigation and fail to interview key witnesses and look into key facts in order to prevent uncovering evidence that would support coverage." *Great West*, 605 F. Supp. 2d at 981.  A bad faith claim may be stated where the plaintiff alleges that the insurer "acted in bad faith by failing to investigate his claim, failing to apply provisions of [the] policy, and failing to interpret the policy in [the insured's] favor." *Superior Credit Union, Inc.*, 2019 WL 5557343 at *5 (quoting *Poneris v. Pennsylvania Life Ins. Co*., 2007 WL 3047232 at *3 (S.D. Ohio Oct. 18, 2007)).  Even if a claim is ultimately paid, an insurer's "'foot-dragging' in handling and evaluating the claim may support a bad-faith cause of action." *McNair v. State Farm Fire & Cas. Co*., 2013 WL 6795616 at *5 (Ohio App. 6th Dist. Dec. 20, 2013) (quoting *Drouard v. United Servs. Auto. Assn*., 2007 WL 707532 at *2 (Ohio App. 6th Dist. March 9, 2007)).

 "On a motion for summary judgment, Ohio law directs courts to assess bad-faith-denial-of-coverage claims from the perspective of what information motivated the insurer's denial." *Smith v. Allstate Indem. Co*., 304 Fed. Appx 430, 432 (6th Cir. 2008).  "Viewing the evidence in the light most favorable to the insured, courts ask whether 'the claim was fairly debatable and the refusal was

premised on either the status of the law at the time of the denial or the facts that gave rise to the claim.'" *Smith,* 304 Fed. Appx. at 432 (quoting *Tokles & Son, Inc.*, 605 N.E.2d at 943). *See also Retail Ventures, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 691 F.3d 821, 834 (6th Cir. 2012). "An aggrieved insured must respond to the insurer's motion 'with evidence which tends to show that the insurer had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification....'" *Smith*, 304 Fed. Appx. at 432 (quoting *Tokles & Son, Inc.*, 605 N.E.2d at 943). *See also Trego v. Allstate Ins. Co*., 552 Fed. Appx. 449, 451 (6th Cir. 2014).

For the following reasons, the Court finds that, even viewing the evidence in a light most favorable to Plaintiff, Defendant is entitled to summary judgment on Plaintiff's bad faith claim.  As set forth at length above, Mr. Steinbeck promptly investigated Plaintiff's claim when he inspected the Property on December 7, 2021 and obtained approval to retain an engineer to opine regarding the cause of loss.  (Doc. No. 27-1 at ¶ 4.)  Defendant then retained Mr. Caldwell, who conducted a thorough inspection of the Property and authored a lengthy Report that determined that the loss was caused by the combination of the lack of adequate anchorage between the brick veneer and the building structure, the lack of proper expansion joints in the brick veneer, the normal expansion/contraction of the brick veneer, and the differential movement between the veneer and the steel beams. (Doc. No. 27-7 at ¶¶ 5- 8.)  Mr. Caldwell also opined that there were visible signs that the brick had been subjected to outward movement for some time, including displaced and bulged brick, discoloration, the caulk line running along the south wall, and rust jacking.  (*Id*. at ¶¶ 11, 12, 15, 16.)  Notably, Mr. Caldwell opined that these signs had been present for some time, including in historic photographs of the Property from 2011 and 2019.  (Doc. No. 27-9 at ¶¶ 10-13.)  Based on

Mr. Caldwell's Report, Mr. Steinbeck concluded that the loss did not fall within the ACC because Mr. Caldwell's Report "did not reflect any evidence of building decay that is hidden from view." (Doc. No. 27-1 at PageID# 687.)

The Court finds that, given Mr. Caldwell's Report, Defendant had a reasonable justification for concluding that the December 4, 2021 loss was not covered under the Policy.  Although Plaintiff later presented some evidence that any building decay was hidden from view (i.e., Mr. Patton's deposition testimony and Ms. Makridis' Declaration), this evidence only made Plaintiff's claim fairly debatable.  As noted above, an insurer may deny a claim where the claim is fairly debatable and the denial is based on a genuine dispute over the facts giving rise to the claim.  *See, e.g., Tokles & Son, Inc*., 605 N.E.2d at 943.  Under similar circumstances, courts have not hesitated to grant summary judgment to insurers.  *See, e.g., Larrison v. Westfield Ins. Co*., 2024 WL 4233805 at * 4-5 (Ohio App. 10th Dist. Sept. 19, 2024) (granting summary judgment to insurance company on plaintiff's bad faith claim where insurer denied plaintiff's claim based on reports of two inspectors, one of which was a professional engineer); *Corbo Properties, Ltd. v. Seneca Ins. Co*., 771 F.Supp.2d 877 (N.D. Ohio 2011) (granting summary judgment to insurance on plaintiff's bad faith claim where insurer denied plaintiff's claim based on report of an independent fire investigation firm that concluded that the cause of fire was incendiary and the report of an independent forensic accountant to determine that plaintiff had motive to commit arson.)

Based on the above, the Court finds that, viewing the evidence in a light most favorable to the insured, there is no genuine issue of material fact that Defendant was reasonably justified in denying Plaintiff's claim.  Accordingly, and for all the reasons set forth above, the Court finds that Defendant is entitled to summary judgment in its favor with respect to Plaintiff's Bad Faith claim (Count III).

## V.  Conclusion

Accordingly, and for all the reasons set forth above, Plaintiff's Motion to Strike (Doc. No. 41) is DENIED.  Plaintiff's Motion for Summary Judgment (Doc. No. 32) is DENIED.  Defendant's Motion for Summary Judgment (Doc. No. 27) is GRANTED IN PART and DENIED IN PART as follows.  Defendant's Motion is GRANTED with respect to Count III, but DENIED with respect to Counts I and II.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
Date:  November 5, 2025                                   U. S. DISTRICT JUDGE

80